**In re FIRST HUMANICS
CORPORATION, Debtor.**

**Bankruptcy No. 89–42041–1–11.**

United States Bankruptcy Court,
W.D. Missouri.

Feb. 8, 1991.

Laurence M. Frazen, Bryan, Cave, McPheeters & McRoberts, Kansas City, Mo., for Health Care Capital, Inc.

Michael Flanagan, Polsinelli, White, Vardeman & Shalton, Kansas City, Mo., for First Humanics Corp.

## MEMORANDUM OPINION

KAREN M. SEE, Bankruptcy Judge.

The issue is whether Health Care Capital, Inc. (HCC) is a party in interest with standing to file a plan in the Chapter 11 case of debtor First Humanics Corporation pursuant to 11 U.S.C. § 1121(c).[1] The court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a), (b) and 157(a). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). This memorandum shall constitute the court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

## FACTS

Debtor, a not-for-profit corporation in the business of owning and operating nursing and extended care residential facilities in Michigan, Illinois, Indiana, and Pennsylvania, filed a Chapter 11 case on September 13, 1989.

On September 1, 1989, 12 days before filing bankruptcy, debtor entered into a an agreement with HCC under which HCC assumed the management of the debtor's health care facilities.[2] On September 15, 1989, debtor filed a motion to assume the management agreement with HCC. By order dated December 27, 1989, debtor was authorized to assume the agreement, subject to certain modifications.

The management agreement included a termination clause which allowed debtor to terminate the agreement without cause upon 60 days prior written notice to HCC. Upon termination without cause by debtor, the agreement provided that debtor would pay HCC an additional management fee. HCC asserts the additional fee will be an administrative expense in the approximate amount of $118,000.00.

When HCC assumed management in conjunction with the filing of the Chapter 11 petition, debtor's facilities were in great disorder. Primarily through the efforts of HCC, the operations of the nursing homes and extended care facilities have been stabilized. Now, as compared to the time of filing, staffing has leveled off, morale is good, bills are timely paid, financial statements are accurate, budgets are reliable, census has been maintained, and a higher standard of care has been achieved.

In preparation for its reorganization plan, in July, 1990 debtor contacted several management companies to inquire whether they were interested in managing debtor's facilities. Debtor requested that interested companies prepare a detailed proposal regarding management of debtor's facilities post-confirmation and a financing proposal which would provide for debtor to obtain a $5,000,000.00 loan to be used in financing debtor's plan.

---

1. Appearances were entered by Michael Flanagan for debtor; Laurence Frazen for HCC; Alan Shmaruk and Gary Barnes for the bondholders' committee; Norman Beal for the unsecured creditors' committee; Timothy Hurley for Dixon National Bank; John Evans for Southside National Bank of St. Louis; Donald Loudon for First of America Bank; Steven Block for eight individual bondholders; and Cynthia Edwards for the U.S. Trustee.

2. Debtor's facilities were managed by First Health Care, Ltd. until September 13, 1989, the date debtor filed its Chapter 11 case. On September 13, immediately prior to the filing, HCC assumed management of debtor's facilities.

After reviewing several proposals, debtor, the bond trustees, and the bondholders' committee interviewed three management companies: HCC; Health Care Properties, Inc.; and The Tutera Group. Eventually, The Tutera Group was selected as the company to manage the facilities post-confirmation and to assist debtor in obtaining a $5,000,000.00 loan from The Merchant's Bank.

Debtor's previous plans and disclosure statement, filed in June, 1990, were based on the assumption that HCC would continue to operate debtor's facilities post-petition. HCC alleges that about November 14, 1990, it learned for the first time that debtor intended to file a plan which would terminate the HCC management agreement and replace HCC with another management company. On November 16, 1990, debtor filed its First Amended Disclosure Statement together with its Second Amended Plan which provide for The Tutera Group to manage debtor's facilities post-confirmation. On November 28, 1990, debtor sent HCC written notice of its intent to terminate the management agreement effective February 1, 1991.

HCC, having learned that its management agreement would be terminated by debtor's plan, began to formulate its own plan of reorganization which would, among other provisions, allow HCC to continue as the management company post-confirmation. HCC was interested in filing its own plan due to its substantial economic stake in the reorganization process as the manager of debtor's facilities for the past 15 months. HCC has committed personnel, capital, and other significant resources to debtor's operations and has declined to pursue other profitable contracts in order to fulfill its present and anticipated future role as manager of debtor's facilities.

In order to avoid unnecessary litigation over whether HCC had standing as a party in interest to propose a plan, HCC purchased, pursuant to Bankruptcy Rule 3001(e)(2), three pre-petition unsecured claims totalling $1,187.77 and some bonds. Having obtained the status of a creditor by virtue of the assignments of the pre-petition claims, HCC reasoned that it was clearly a party in interest entitled to file a plan.

On November 21, 1990, HCC filed a competing disclosure statement and plan. HCC's plan closely resembled debtor's plan with the exception of a few significant differences, one of which was that HCC would continue to manage debtor's facilities.

On November 26, 1990, a hearing was held on approval of debtor's First Amended Disclosure Statement dated November 16, 1990. During that hearing, several parties raised objections to the standing of HCC to file a competing plan. The court requested briefs and set a hearing on the issue.[3]

## ARGUMENTS

HCC argued that it had standing to propose a plan within the meaning of 11 U.S.C. § 1121(c) as a party in interest and as a creditor. HCC relied on case law broadly interpreting "party in interest" to permit involvement of all parties whose interests are affected by the reorganization process. HCC argued that as 1) the manager of debtor's facilities post-petition, 2) an administrative expense claimant, and 3) a creditor as defined in § 101(9)(A) by virtue of its post-petition purchase of pre-petition claims, it qualified as a party in interest because its interests would be significantly affected by debtor's reorganization proceedings. The unsecured creditors' committee supported HCC's arguments.

In addition, HCC requested a joint hearing on approval of HCC's and debtor's disclosure statements in an effort to place the competing plans on the same timetable. Due to the objections to debtor's insufficient notice and the unsettled issue of HCC's standing, the court reset the hearing on approval of the disclosure statements for December 6, 1990.

**3.** On November 16, 1990, 10 days before the hearing date for debtor's original disclosure statement filed June 20, 1990, debtor filed an amended disclosure statement and plan and sought to use the same hearing date for approval of the amended disclosure statement. Several parties objected to approval of the amended disclosure statement on the basis that insufficient notice was given for the substantial amendments to debtor's plan.

Objections to HCC's standing to file a plan were raised by debtor, the bondholders' committee, and several banks which serve as indenture trustees on debtor's bond issues (hereinafter "objectors"). The objectors argued that HCC did not have a sufficient stake in the reorganization process to qualify as a party in interest. The objectors relied on case law which held that unsuccessful bidders on property lacked standing to object to sales of property. The objectors argued that by analogy, like an unsuccessful bidder attempting to block a sale, HCC was improperly utilizing § 1121(c) to retain management of debtor's facilities. The objectors also argued that HCC was not a creditor within the meaning of § 1121(c) by simply purchasing claims. The objectors argued that the goals of Chapter 11 reorganization would be subverted should HCC be allowed to file a competing plan. Lastly, the objectors argued that allowing HCC to file a competing plan would cause considerable confusion for certain unsophisticated creditors voting on dual plans.

## FINDINGS AND CONCLUSIONS

After considering policies underlying § 1121(c) of the Code, and the briefs, arguments, and case law (neither the parties nor the court found any cases exactly on point), the court concludes that HCC has standing to file a plan of reorganization pursuant to § 1121(c), both as a party in interest and as a creditor.

### A. Standing as a Party in Interest

Section 1121(c) provides:

Any party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may file a plan....

Although § 1121(c) lists specific categories, 11 U.S.C. § 102(3) dictates that the word "including," as used in the Code, is not intended to be limiting. The legislative history also confirms that the list of parties

in interest in § 1121(c) was not meant to be exhaustive. *In re River Ben–Oxford Associates*, 114 B.R. 111, 113 (Bankr.D.Md.1990) (quoting H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 406 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 118 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5904, 6362).

Although no definition of "party in interest" is found in the Code, courts have consistently held that party in interest status is an expandable concept depending on the particular factual context in which it is applied. *In re River Bend–Oxford Associates*, 114 B.R. at 113. Courts also have consistently held that "the concept of 'party in interest' is an elastic and broad one designed to give the Court great latitude to insure fair representation of all constituencies impacted in any significant way by a chapter 11 case." *In re River Bend–Oxford Associates*, 114 B.R. at 113, citing *In re Johns–Manville Corp.*, 36 B.R. 743, 754 (Bankr.S.D.N.Y.1984), *aff'd*, 52 B.R. 940 (S.D.N.Y.1985). *Accord, In re Public Service Co. of New Hampshire*, 88 B.R. 546, 550 (Bankr.D.N.H.1988).

The determination whether an entity qualifies for party in interest status must be made by the court on a case by case basis. *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir.1985); *In re Texaco, Inc.*, 81 B.R. 820, 828 (Bankr.S.D.N.Y.1988) (recognizing absent class members as potential creditors). Additionally, the determination must be made in light of the specific reorganization context for which the determination is sought. *In re River Bend–Oxford Associates*, 114 B.R. at 114; *In re Public Service Co. of New Hampshire*, 88 B.R. at 554.

Most applicable to the facts at hand is *In re River Bend–Oxford Associates*, 114 B.R. 111 (Bankr.D.Md.1990), where the court allowed a plan to be proposed by parties who were not in one of the specific categories in § 1121(c). The parties had no direct or legal relationship with the debtor.[4]

---

4. The parties in *River Bend–Oxford Associates* were a limited partner and a general partner of a limited partnership which was one of two general partners comprising the debtor.

Here, HCC, as debtor's post-petition manager, has a direct relationship with debtor.

HCC is not an interloper. Rather, HCC has a substantial interest in debtor's reorganization process. Based on HCC's continuous management of debtor's facilities post-petition for 15 months, HCC has played a significant role in debtor's reorganization efforts and has made a substantial financial investment in debtor's reorganization process with reasonable anticipation that its management would continue.

At the time the case was filed, HCC was a pre-petition creditor due to its pre-petition management contract which debtor assumed post-petition. In addition to administrative expense claims for management fees for the months of November and December, 1990, and January, 1991, HCC will be owed a significant administrative claim if debtor terminates its management contract. HCC, as a significant administrative claimant, is a party in interest. The fact that debtor has remained current to date on payments to HCC and that administrative expense claims are expected to be paid in full by the effective date of the plan does not remove HCC from the status of a party in interest. Furthermore, if HCC's management contract is terminated, HCC will lose expected future revenues.

■ By allowing only parties in interest to be heard regarding a reorganization, the Code seeks to advance the goal of speedy and efficient reorganization. *In re Public Service Company of New Hampshire*, 88 B.R. at 554 (citing *In re Hyde Park Partnership*, 73 B.R. 194 (Bankr.N.D.Ohio 1986), and *In re Charter Co.*, 50 B.R. 57 (Bankr.W.D.Tex.1985)).

Submission of HCC's plan will not unduly prejudice or delay any party, nor will it impede the policies of speed and efficiency. HCC is not attempting to slow or block the debtor's reorganization process. HCC is prepared to offer its disclosure statement and plan on the same timetable as debtor's. In addition, HCC and the unsecured creditors' committee assert that HCC's plan contains alternative provisions which may treat certain classes of creditors more favorably than under debtor's plan.

By allowing HCC to go forward with its plan, the equally important policies of providing alternatives to voting creditors and maximizing returns to creditors are promoted.

### B. Standing as a Creditor

■ Section 101(9)(A) defines creditor as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor."

HCC holds pre-petition claims which were validly transferred to HCC pursuant to Bankruptcy Rule 3001(e)(2). There was nothing improper about HCC's acquisition of these claims. The acknowledged purpose of the transfers was to remove any question as to whether HCC had a right to be a plan proponent. The definition of a creditor in § 101(9) is clear. The legislative history to the Code indicates that the only requirement to be a creditor is that an entity be the "holder of pre-petition claims against the debtor." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 309–10 (1977), U.S. Code Cong. & Admin.News 1978, p. 6266.

"Under the Code, as under the prior Act, whenever the statute accords rights and privileges to creditors or subjects them to duties, anyone holding a claim comes within the scope of such provision, unless the express language or the context require additional qualifications to be met." 2 *Collier on Bankruptcy* ¶ 101.09, at 101–38 (15th ed.1990). There are no such "additional qualifications" in § 1121(c). Therefore, it is of no consequence when HCC acquired its claims. Moreover, under the particular facts of this case, the objectors have failed to show any bad faith or improper motive which would require HCC's pre-petition claims to be disregarded.

The court agrees with conclusions reached in dicta in two cases which are factually on point. *In re Allegheny International, Inc.*, 118 B.R. 282, 286 (Bankr.W. D.Penn.1990), and *In re American 3001 Telecommunications, Inc.*, 79 B.R. 271, 272 (Bankr.N.D.Texas 1987). In both cases, unrelated entities sought to file plans under which they would acquire con-

trol of the debtors. The courts in those cases concluded that the unrelated entities became parties in interest entitled to file plans pursuant to § 1121(c) by virtue of post-petition purchases of pre-petition claims. In *Allegheny,* the unrelated entity held no interest as a creditor or equity security holder of the debtor until immediately prior to filing its proposed plan which also mirrored in large part the debtor's plan. In *American 3001 Telecommunications,* the entity became a party in interest by acquiring an unsecured claim in the amount of $33.60 prior to filing its plan.

As a creditor of the debtor, HCC is one of the enumerated parties in § 1121(c) with a right to file a plan. As previously explained, under the particular facts of this case, HCC's status as a past and current administrative claimant, with a sizeable financial stake in debtor's post-petition operations, also gives HCC an enhanced status which is as significant as that of a prepetition creditor. Additionally, HCC held a pre-petition claim arising from its pre-petition management contract prior to the post-petition assumption of its executory management contract. In summary, HCC's various financial and legal relationships with debtor—both pre-petition and post-petition—are so substantial that HCC should be permitted to file a plan.

Objectors assert that a good faith requirement should be imposed upon HCC's acquisition of claims. The objectors rely heavily on § 1126(e) relating to plan confirmation and designation of votes not cast in good faith. Even if an analogous good faith requirement were read into § 1121(c),[5] the actions of HCC were in good faith. HCC did not purchase the claims or the bonds with the intent to block, impede or in any way manipulate confirmation of debtor's plan. To the contrary, HCC's purchase of the claims and bonds was done in good faith and not by any means prohibited by law. HCC is attempting to submit an alternative plan which may ultimately be more favorable, not only with respect to

HCC but also to other interested parties, such as the unsecured creditors. Furthermore, the good faith voting requirement set forth in § 1126(e) does not require, nor can it expect, a creditor to act with selfless disinterest. *In re Gilbert,* 104 B.R. 206, 216 (Bankr.W.D.Mo.1989) (citing *In re Federal Support Co.,* 859 F.2d 17, 19 (4th Cir.1988)). The mere fact that a purchase of a creditor's interests is made post-petition does not indicate bad faith. *In re Gilbert,* 104 B.R. at 216.

The objectors cite several cases where courts have found that the purchase of claims was in bad faith. *See In re P.R. Holding Corporation,* 147 F.2d 895 (2d Cir.1945); *In re Beugen,* 99 B.R. 961 (9th Cir. BAP 1989); *In re Allegheny International, Inc.,* 118 B.R. 282 (Bankr.W.D.Pa. 1990) (involving bad faith purchase of claims to manipulate voting and defeat debtor's plan). The holdings of these cases are inapplicable to the facts in this proceeding. Cases such as *Allegheny, P.R. Holding* and *Beugen* focus on the motive of the party purchasing the claims to determine bad faith. Whether it be manipulation of the confirmation process as in *Allegheny* or harassment as in *Beugen,* the central theme in these cases is that the motive for the purchase of the claims was other than promoting the reorganization process.

HCC had no such contrary motive. HCC did not purchase the three modest-sized claims in order to control or manipulate voting. It purchased the claims merely to avoid protracted litigation and to settle any doubts about its standing to file a plan.

The objectors also rely on cases where jilted bidders have objected to sales of assets pursuant to § 363. *See In re Planned Systems, Inc.,* 82 B.R. 919 (Bankr.S.D.Ohio 1988); *In re Atlanta Packaging Products, Inc.,* 99 B.R. 124 (Bankr.N.D.Ga.1988). These cases also miss the mark. As in the cases on purchase of claims, the motivation behind the purchase of the claim is the key issue. For example, *Atlanta Packaging* focused on the parties' purchase of a claim

---

**5.** Even though § 1126(e) is not directly applicable to § 1121(c), it could be argued that a good faith requirement is implicit since in order to confirm HCC's plan, § 1129(a)(3) requires a finding that HCC's plan was proposed in good faith.

for the purpose of harassing a competitor. Additionally, these cases deal with situations where a party had lost an open bidding process supervised by the court. To the contrary, HCC is merely trying to put forth a "bid" in the form of a plan of reorganization. HCC is willing to take the risk that its plan may not be accepted by the creditors.

HCC has not done anything other than perhaps frustrate the debtor and the bondholders who have been working very hard to formulate what has been referred to as a consensual plan and who are now surprised to have a competing plan come to the table late in the game. However, the timing alone does not rise to the level of bad faith, especially since HCC explained that it sought to file a plan at a late date only because it learned at that late date of debtor's proposed change of management, contrary to provisions of the earlier plan which had been on file for several months.

It is inappropriate to construe HCC's actions as an attempt to upset an alleged consensual plan. The consensus is only among the debtor, the bondholders' committee, and certain indenture trustees. Thousands of other individual bondholders and unsecured creditors are not part of the consensus and should be allowed to look at both alternatives presented in the competing plans. Debtor's plan is not consensual to all of them. For example, eight individual bondholders retained counsel, separate from the bondholders' committee counsel, in order to go on record in support of HCC being allowed to file a plan so they would have an opportunity to choose between the two competing plans.

As argued by the unsecured creditors' committee, debtor's plan appears to be heavily influenced by the bondholders and bond trustees to the detriment of the general unsecured creditors. The negotiations and decisions, including the decision to retain The Tutera Group as the new manager, were heavily influenced by the bondholders' committee and the indenture trustees whose interests are vastly different than those of the unsecured creditors.

As to bondholders, the two plans are essentially the same. The bond interests prefer the debtor's plan and do not want an alternative plan available for other interests to choose because elections are easier to win when there is no opponent. In an attempt to deny an alternative to other classes, the objectors have chosen to attack HCC's standing. Reversing the bad faith argument asserted by the objectors, HCC and the unsecured creditors' committee could argue that objections to HCC's plan are a sign of bad faith because the objections could result in certain interested parties receiving less than they would have under HCC's plan.

### C. Confusion From Competing Plans

The objectors assert that allowing HCC to proceed with a plan will cause undue confusion to creditors. The risks of confusion is inherent any time a court allows more than one plan to be distributed to creditors. The Code specifically authorizes the filing and distribution of more than one plan after expiration of debtor's exclusive period. If Congress had intended for only one plan to be distributed at a time, it would have written that restriction into the Bankruptcy Code.

To help reduce the potential for confusion, the two plans will be distributed together with a jointly prepared cover letter in simple, readable language included in the packet to explain the voting procedures and the differences between the two plans. This procedure has been employed without undue confusion in other cases in this court. Confusion from circulating two competing plans in this case will not be any greater than in other situations where the court has allowed competing plans to proceed simultaneously. The argument that circulating competing plans would prevent creditors from being able to fairly judge each plan on its own merits is simply without merit. In light of the extent to which the two plans mirror each other, the reorganization proceedings are not taking a drastic change in mid-course, and accordingly, it does not appear that the goal of prompt and efficient reorganization would be frustrated.

Accordingly, for the foregoing reasons, it is hereby ORDERED that HCC has standing as both a party in interest and a creditor to propose a competing plan of reorganization pursuant to 11 U.S.C. § 1121(c).