In re APPLEGATE PROPERTY, LTD., a Texas Limited Partnership, Debtor.

Bankruptcy No. 90–50995–C.

United States Bankruptcy Court, W.D. Texas, San Antonio Division.

Oct. 5, 1991.

Stephen C. Stapleton, Decker, Hardt, Kopf, Harr, Munsch & Dinan, P.C., Dallas, Tex., for debtor.

John T. Sanders, IV, Sawtelle, Goode, Davidson & Troilo, P.C., San Antonio, Tex., for Resolution Trust Corp.

## MEMORANDUM DECISION

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for consideration the Motion of the Resolution Trust Corporation, as Conservator for Commonwealth Savings Association, to Strike Debtor's Third Amended and Restated Disclosure Statement and Third Amended and Restated Plan of Reorganization and Motion to Strike Votes of Debtor, together with the Objections thereto by the Debtor. This is the court's decision thereon.[1]

## JURISDICTION

This court has original subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and may enter a final order with respect thereto. 28 U.S.C. § 157(c)(2). This matter is a core proceeding. 28 U.S.C. § 157(b)(2)(L).

## FACTUAL BACKGROUND

On April 2, 1990 Applegate Property, LTD., a Texas Limited Partnership ("Debtor/Applegate") filed for relief under Chapter 11 of the Bankruptcy Code. The Debtor has filed a number of disclosure statements and plans that, for reasons not now important here, have not been approved. The Debtor's Third Amended Disclosure Statement was approved by the court on December 3, 1990. On November 9, 1990, the Resolution Trust Corporation ("RTC") filed its own Disclosure Statement and Plan. This Disclosure Statement was also approved. The competing plans were then set for confirmation on the same date.

The gravamen of the RTC's motions was that a related entity of the Debtor, Daseke Consulting, Inc. ("Daseke"), was covertly purchasing claims in order to gain an advantage in the voting process. Daseke is a sister corporation to Daseke Properties Corporation and Daseke Associates, LTD., the general partners of the Debtor. The RTC established that Daseke had contacted a significant number of unsecured creditors classified as Class 5 Claimants in both the Debtor's and RTC's proposed plans of reorganization. Daseke had, in fact, obtained assignments of eight unsecured claims totalling $4,262.30, by paying the claimants the face value of their claims. These eight claims total 57.82% of the unsecured trade claimants listed in the Debtor's schedules.

Applegate responds that it only took an assignment of these claims out of fear that the RTC intended to *itself* purchase certain unsecured claims of the Debtor's estate in an effort either to block confirmation of the Debtor's Plan or to assure confirmation of its own Plan. Daseke ultimately voted these eight claims against the RTC's Plan and in favor of Debtor's Plan, effectively achieving the precise result for the Debtor they sought to avoid the RTC's achieving for itself.

RTC asserts that the relationship between Daseke Consulting, Inc., Daseke Property Corporation, Daseke Associates, LTD. and the Debtor, along with the transactions incident thereto, i.e. the claims acquisition, should have been disclosed by the Debtor in its Disclosure Statement, to satisfy the "adequate information" requirements of Section 1125. RTC contends that such failure is grounds to strike the Third Amended Disclosure Statement and its accompanying Plan.

RTC adds that Daseke's covert purchasing of claims is also grounds to reject all the votes cast by Daseke Consulting, Inc. in both plans, as such action was not grounded in good faith, pursuant to 11 U.S.C. § 1126(e).

---

1. This is the court's written decision, reflecting a bench ruling made in the case, and for which orders have already been submitted and entered.

RTC also charges that the notice provisions of Bankruptcy Rule 3001(e) were not met on some transfers (e.g. the transfer of the claim of City Public Service to Daseke), and that such transfers were not properly documented with the court. Debtor counters that the notice and documentation requirements have been met within a reasonable period of time, so that at least the spirit, if not the letter, of Rule 3001(e) has not been violated.

RTC further contends that Daseke failed to properly file their proofs of claim for the transferred claims. Debtor responds that a transferor's proof of claim is *prima facia* evidence as to the validity of the claim itself under Section 502(a), so that no further proof of claim need be filed to memorialize the transferred claim. Due to the resolution of the foregoing issues (see below), the court need not decide this last issue.

### ANALYSIS

#### 1. *Adequate Information*

The first issue is whether the Debtor's disclosure statement has satisfied the "adequate information" requirements mandated by the Bankruptcy Code. *See* 11 U.S.C. § 1125(a)(1). Specifically, should the relationship between the Debtor, Daseke Consulting, Inc. (purchaser of the claims), Daseke Property Corporation and Daseke Associates, LTD., and the attendant claims acquisitions, have been disclosed in the Debtor's Disclosure Statement?

Section 1125(b) provides, in relevant part, that an "acceptance or rejection of a plan may not be solicited ... unless [there has been] ... a written disclosure statement approved ... by the court as containing adequate information." Adequate information means:

.... information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical and reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan....

11 U.S.C. § 1125(a)(1). The issue of adequate information is usually decided on a case by case basis and is left largely to the discretion of the bankruptcy court. *In re A.H. Robins Co.*, 880 F.2d 694 (4th Cir. 1989), *cert. denied*, 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989) (quoting *Matter of Texas Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir.1988), *cert. denied*, 488 U.S. 926, 109 S.Ct. 311, 102 L.Ed.2d 330 (1988)); *In re Scioto Valley Mortgage Co.*, 88 B.R. 168 (Bankr.S.D.Ohio 1988). The legislative history offers this general guidance:

A concept key to disclosure is that of 'adequate information.' This phrase is both defined by statute and left open to development on a case by case basis, Congress intending that the courts take a practical approach as to what is necessary under the circumstances of each case. Thus, in keeping with the need for flexibility in Chapter 11 cases with their frequent uncertainties, it was anticipated that the courts would balance the equities in each case, weighing the cost of preparation of the statements, the need for speed, and the protection of investors.

*See* H. Rept., No. 95–595, 95th Cong., 1st Sess. 408, 409 (1977), U.S.Code Cong. & Admin.News 1978, 5787.

The relationship of a debtor with affiliates is the type of information that should ordinarily be disclosed. *In re Dakota Rail Inc.*, 104 B.R. 138, 143 (Bankr.D.Minn. 1989). Information concerning the status of various partnerships in which the debtor may have an interest, including the nature or extent of any such interest or relationship, is also normally expected to be disclosed. *In re Scioto*, 88 B.R. at 171. Finally, disclosure statements which are misleading, or which contain unexplained inconsistencies, should not be approved. *In re Unichem Corp.*, 72 B.R. 95, 97 (Bankr. N.D.Ill.1987).

By the same token, a disclosure statement need not meet the extensive disclo-

sure requirements of the securities laws for registration statements and the like. Indeed, Section 1125(d) provides that the adequacy of a disclosure statement is not governed by any otherwise applicable non-bankruptcy law, rule or regulation. 11 U.S.C. § 1125(d); *see In re A.C. Williams Co.*, 25 B.R. 173, 176 (Bankr.N.D.Ohio 1982) (lack of compliance with securities laws is irrelevant to whether disclosure statement should be approved). Section 1125(d), however, does not prohibit a court from seeking *guidance* from securities laws for the kind of information that might be appropriate in a given disclosure statement on a case by case basis. *See* S.Rep. No. 989, 95th Cong., 2d Sess. 228 (1978); 5 *Bankr.Serv.L.Ed.*, § 42.56 at 77 (1987).

Certainly a related entity's acquiring a block of stock that could potentially dictate the buyout of a company would often be an appropriate subject for disclosure under the securities laws. The materiality standard adopted by the Supreme Court with respect to proxy solicitations under section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 77k (1975), and Rule 14a–9, 17 C.F.R. § 240.14a–9 (1975), promulgated thereunder, is that "an omitted fact is material if there is a reasonable likelihood that a reasonable investor would consider it important in deciding how to vote." *TSC Industries, Inc. v. Northway Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *see In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr.S.D.N.Y.1990). In addition, 15 U.S.C. § 78m(d) imposes disclosures requirements when an entity acquires beneficial ownership of 5% or more of certain classes of stock. Beneficial ownership can be viewed in terms of voting power. *S.E.C. v. First City Financial Corp., Ltd.*, 890 F.2d 1215, 1221 (D.C.Cir.1989).

In our fact situation, Daseke's acquisition of claims shortly before consideration of the plans gave Daseke both ownership in the class and the right to control the voting of such class, along with the ability to block the RTC's plan. Disclosure of such a position is certainly material under the *TSC Industries* standard for proxy solicitations, and appropriate under Section 78m(d) of Title 15. Its disclosure is properly mandated in the bankruptcy context as well, because it is a material fact relevant to the voting process, for at least three reasons. First, it is material to creditors of the class in which claims were acquired, as only some of the claims might have been acquired, and not all claims might have received the same consideration. Second, it is material to the court's determination of whether the confirmation standards have been met, as claims acquired by an insider entity might no longer count toward acceptance for purposes of Section 1129(a)(10), and the process of acquisition may undermine the good faith requirements of Section 1129(a)(3). Third, it is material to other classes of creditors who might well challenge whether the claims acquisition amounts to *de facto* unfair discrimination.[2]

Applying these notions to the Debtor's Disclosure Statement, we need only ask whether a hypothetical reasonable investor in the position of the estate's creditors, i.e. "... typical of holders of claims or interests of the relevant class ...," would want to know that a related entity of the Debtor was acquiring claims in a potentially controlling class in order to dominate such class for voting purposes. *See* 11 U.S.C. § 1125(a)(1). The obvious answer is yes.

Debtor's remonstrations are misplaced as they focus on the notion of harm, that is, if no one is harmed by failing to disclose certain information, or such disclosure

---

2. A much more difficult issue would be presented were a third party, either unknown or hostile to the Debtor, to purchase claims in a covert or overt attempt to gain control of a voting class and ultimately of the Debtor. *See e.g., In re Allegheny Intern., Inc.*, 118 B.R. 282, 289 (Bankr. W.D.Pa.1990). It would place a high burden indeed on plan proponents if they were required to disclose events of which they had no knowl-

edge or over which they had no control. Plan proponents would be forced to make investigations into whether claims acquisition were even taking place in order to satisfy disclosure requirements. They would have to monitor such activity as well, and perhaps guess at its impact on the plan. A blanket rule mandating disclosure of all claims acquisitions activity in all cases is thus not appropriate.

would have no effect on the outcome, then the disclosure is not necessary. Debtor contends, for example, that the purchase of the claims by Daseke need not have been disclosed because the acquisition will not affect the vote tally for determining acceptance of the plan under 11 U.S.C. § 1129(a)(10). They also argue that the lack of disclosure does not prejudice the RTC or change the resulting payments to the unsecured creditor's under either plan.

Nothing in Section 1125 even vaguely suggests that the court's role in evaluating adequacy of disclosure is couched in terms of *limiting* the kinds of information that should be disseminated to creditors, but a harm-oriented test does precisely that. A court's legitimate concern under Section 1125 is assuring that hypothetical reasonable investors receive such information as will enable them to evaluate for *themselves* what impact the information might have on their claims and on the outcome of the case, and to decide for themselves what course of action to take. *See In re Crowthers McCall Pattern, Inc.*, 120 B.R. at 300 ("the command of section 1129(a)(2) for compliance with the Code, however, does not admit inquiry as to whether a class would have approved a plan notwithstanding the error or whether approval by that class is required. Disclosure statements are required to contain liquidation analyses that enable creditors to make their own judgment as to whether a plan is in their best interests and to vote and object to a plan if they so desire"). A materiality standard is both easier to apply and less likely to deprive creditors of data relevant to their decision-making process. Not incidentally, it is also more likely to result in a process more consistent with the general public's notions of honesty and fair play, qualities which are all too often perceived to be casualties in the bankruptcy process.[3]

Debtor cannot legitimately argue that a reasonable investor could be expected to make an informed decision without information about Daseke's claims acquisition. *In re Scioto*, 88 B.R. at 171; *In re Dakota Rail, Inc.*, 104 B.R. at 143. That information was readily available and could have (indeed, should have) been incorporated in the Debtor's Disclosure Statement. The Disclosure Statement is thus misleading, as it portrays the class of unsecured trade debt as unrelated when, in fact, that class is controlled by an entity related to the Debtor, giving the Debtor ultimate control over the outcome of its own plan, and a blocking position on other plans. That such a fact might be apparent upon a detailed review of court records does not excuse the plan proponent from making the disclosure. *In re Unichem Corp.*, 72 B.R. at 97; *see In re Crowthers McCall Pattern, Inc.*, 120 B.R. at 300; *S.E.C.*, 890 F.2d at 1221; *see also* 15 U.S.C. § 77k. Accordingly, this court holds that Debtor's Disclosure Statement does not contain "adequate information" as contemplated by Section 1125(a) of the Bankruptcy Code.

The relief requested by the RTC (i.e., "striking" the Debtor's Disclosure Statement) might be appropriate as a sanction, but sanctions hardly seem to be the appropriate remedy in this situation, especially given the fluid state of the law in the area of claims acquisition. *See, e.g., In re First Humanics Corp.*, 124 B.R. 87, 92 (Bankr.W.D.Mo.1991); *In re Allegheny Intern., Inc.*, 118 B.R. at 287; *see also* Bankr. R. 9011; *Business Guides, Inc. v. Chromatic Communication Enterprises,* — U.S. ——, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991) (general discussion of Rule 11). Debtor's Disclosure Statement will not be stricken. However, it is now clear that the Disclosure Statement contains glaring inadequacies which undermine the ability of the court to confirm the Debtor's proposed plan, as a matter of law. 11 U.S.C.

---

**3.** By the same token, a court may determine that *further* disclosure of modifications to the plan at the confirmation is not required, because the information is not of the sort that would affect creditors in anything more than a *de minimis* way. *See In re American Solar King*

*Corp.*, 90 B.R. 808, 823 (Bankr.W.D.Tex.1988); *Matter of Texas Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir.1988). Nothing in this decision is intended to any way circumscribe the continuing viability (and flexibility) of that rule.

§ 1129(a)(2); *In re Copy Crafters Quick-print, Inc.,* 92 B.R. 973, 980 (Bankr. N.D.N.Y.1988); *In re Unichem Corp.,* 72 B.R. at 97. Absent some modification to the Disclosure Statement and its appropriate dissemination, the Debtor currently faces *de jure* denial of confirmation. *In re Century Investment Fund VIII Ltd. Partnership,* 114 B.R. 1003, 1005 (Bankr. E.D.Wis.1990); *In re Pecht,* 57 B.R. 137, 139 (Bankr.E.D.Va.1986).

### 2. *Ballot Disqualification*

A more difficult issue to decide is whether to strike the eight ballots cast by Daseke in favor of Applegate's Third Amended and Restated Plan of Reorganization as well those votes cast by Daseke against the RTC's Liquidating Plan of Reorganization.

RTC proffers a number of distinct reasons for why the ballots should not be counted. First, RTC argues that the purchase of the eight claims by Daseke, a sister corporation to the Debtor, is tantamount to an advance of capital and, as such, the claims have simply been removed from the estate. Second, RTC argues that the votes cast by Daseke were not procured in good faith and, therefore, should be disallowed pursuant to 11 U.S.C. § 1126(e). This assertion is based, in part, on the fact that the Debtor's plan proposes to pay only four cents on the dollar for certain unsecured claimants while "covertly" purchasing these same claims for 100 cents on the dollar. RTC also asserts that the two general partners of the Debtor have breached their fiduciary duty to the creditors by virtue of this payment allocation. This good faith argument is loosely based upon the alleged nonconformity of the claims transfers with Bankruptcy Rule 3001(e).

Debtor retorts, citing numerous cases, that such ballots cast in favor of the Debtor's Plan and those ballots cast against the RTC's Plan should not be disallowed as there was no bad faith in either acquiring or voting the claims.

### Applegate Plan

Before addressing these arguments in detail, the court must take up a preliminary (and potentially dispositive) issue that neither of the parties directly raised, namely whether the votes cast by Daseke Consulting, Inc. in favor of the Applegate Plan violate the "insider rule." *See* 11 U.S.C. § 1129(a)(10) ("if a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by an insider"). If they are, then disqualification of these votes under the theories proposed by the RTC is unnecessary.

■ Daseke is an insider within the meaning of the term as defined in Section 101(30). That section advises that an insider includes the general partner in or of a partnership, a relative of a general partner in or of the debtor, the partnership in which the debtor is a general partner, and a person in control of the debtor. 11 U.S.C. § 101(30). "Insider" also includes an affiliate of the debtor or any insider of an affiliate. "Affiliate" is defined in the Code to include any entity that operates the business or substantially all of the property of the debtor under a lease or operating agreement. While Daseke does not fit precisely into these parameters, the use of the term "includes" in Section 101(30) justifies resort to the rule of *ejusdem generis* to encompass other arrangements consistent with the intended scope of the statute. *Matter of Missionary Baptist Foundation of America, Inc.,* 712 F.2d 206, 210 (5th Cir.1983) ("[u]se of the word 'includes' in Section 101(25) [predecessor to Section 101(30)] evidences Congress' expansive view of the insider class, suggesting that the statutory definition is not limiting and must be applied on a case by case basis").

The Debtor and Daseke Consulting, Inc., along with a number of other related entities including Daseke Properties Corporation and Daseke Associates, LTD., were structured under a fairly complicated arrangement to carry on the business of developing and managing real estate. Each component is part and parcel of a single

whole and the business could not operate as structured without the contribution offered by each individual component. The association can be viewed as one operating unit. The Debtor's principal testified that he is also an officer of each of the related Daseke entities and that those entities cooperate closely in managing the various investments of the Daseke group. In fact, the witness acknowledged that there was a conscious decision to use Daseke Consulting to acquire the claims, as opposed to one of the other Daseke entities, a decision made by the persons who also serve as principals of the Debtor's general partner. Daseke is thus an insider within the meaning of the Code.

■ The claims acquired by Daseke were not insider claims prior to their acquisition. Now, however, they are owned by an insider. Should such claims be counted for purposes of Section 1129(a)(10), or should they be disregarded as insider claims? As a general rule, an entity which acquires a claim steps into the shoes of that claimant, enjoying both the benefits and the limitations of the claim, as a successor in interest. *Matter of Covington Grain Co., Inc.*, 638 F.2d 1357, 1361 (5th Cir.1981); *Carnegia v. Georgia Higher Education Assistance Corp.*, 691 F.2d 482, 483 (11th Cir. 1982). That rule should not apply in this context, however, as it would tend to undermine the straightforward policy of Section 1129(a)(10) to prevent a debtor from using an insider-dominated class to satisfy the requirement that at least one impaired class of creditors vote in favor of the plan. *Matter of Heights Ban Corp.*, 89 B.R. 795, 799 (Bankr.S.D.Iowa 1988). Obviously, the motivation behind the vote of an insider is precisely the same regardless how the insider came by the claim. Accordingly, the acceptances of the Daseke-owned claims must be disregarded for purposes of Section 1129(a)(10). We therefore need not reach the issue of disqualifying these votes, because they do not count under Section 1129(a)(10) anyway. The Applegate Plan thus fails under that section and cannot be confirmed as a matter of law.

*RTC Plan*

A more difficult question is whether the same votes, when cast *against* the RTC plan, should also be disregarded under the same theory. Section 1129(a)(10) says nothing about what to do about votes *rejecting* a given plan, nor does it suggest whether the term "insider" has the same referent when the plan proponent is someone other than the debtor. Fortunately, we may be able to avoid this conundrum entirely if the votes are to be disqualified in the first place under Section 1126(e), as the votes of an entity whose acceptance or rejection of the plan in question was not in good faith, or was not solicited or procured in good faith or in accordance with Title 11. 11 U.S.C. § 1126(e).

The credible evidence presented at the hearing indicates that Applegate held a good faith belief that the RTC itself was going to purchase claims in order to block the confirmation of Debtor's Plan. To protect its own plan, Applegate had Daseke Consulting, Inc., a related entity, purchase the claims, trumping the potential rejection of their Plan by the RTC while at the same time blocking confirmation of the RTC plan. The issue thus narrowed is whether an affiliate or insider of the Debtor can purchase unsecured claims in a given class in order to block the purchase of such claims by a competing entity of the Debtor, to block confirmation of the competing entity's plan, without violating Section 1126(e).[4] That section reads as follows, in relevant part:

> On request of a party in interest ... the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title.

11 U.S.C. § 1126(e).

Neither the Bankruptcy Code nor the Bankruptcy Rules define "good faith" as it

---

4. The court finds that Bankruptcy Rule 3001(e) was substantially satisfied and does not present any relevant legal issues. The advance of capital argument will be summarily addressed further on in this opinion.

is used in Section 1126(e). The Supreme Court has stated that the purpose of imposing a "good faith" standard on the voting process was to prevent the use of "obstructive tactics and hold up techniques" to procure an unfair advantage over other creditors in the confirmation process. *Young v. Higbee Co.*, 324 U.S. 204, 210–11, 65 S.Ct. 594, 597–98, 89 L.Ed. 890 (1945) (discussion of Section 203 of Chapter X of the Bankruptcy Act, the predecessor statute to Section 1126(e)). "One who casts his vote with a purpose of coercing payment to him of more than he might reasonably receive as his fair share of the debtor's estate does not cast his vote in good faith." *In re Federal Support Co.*, 859 F.2d 17, 19 (4th Cir.1988). A creditor also may not cast his vote for an ulterior motive, such as "pure malice, 'strikes' and blackmail, [or] ... to destroy an enterprise in order to advance the interests of a competing business" and expect to have it counted. *In re Federal Support Co.*, 859 F.2d at 19 (quoting *In re Pine Hill Collieries Co.*, 46 F.Supp. 669, 671 (E.D.Pa.1942); *In re MacLeod Co., Inc.*, 63 B.R. 654, 655–56 (Bankr.S.D.Ohio 1986)).

To be sure, good faith voting and solicitation does not demand selfless disinterest. *In re Federal Support Co.*, 859 F.2d 17, 19 (4th Cir.1988) (cited with approval in *In re First Humanics Corp.*, 124 B.R. 87 (Bankr.W.D.Mo.1991)). The court in *Allegheny International* observed, however, that even though

> [t]he mere fact that a purchase of creditors' interests is for ... securing the approval or rejection of a plan does not of itself amount to 'bad faith[,]' [w]hen that purchase is in aid of an interest

other than an interest of a creditor, such purchases may amount to bad faith ... [a]nd certainly there is 'bad faith' when those purchases result in discrimination in favor of creditors selling their interests.

*In re Allegheny Intern., Inc.*, 118 B.R. 282, 289 (Bankr.W.D.Pa.1990) (quoting *In re P-R Holding Corp.*, 147 F.2d 895, 897 (2nd Cir.1945)); *In re Gilbert*, 104 B.R. 206, 216 (Bankr.W.D.Mo.1989) (citing this language with approval). Here, the blocking position obtained by Daseke was in aid of the debtor's interest in defeating the RTC plan (to avoid liquidation), and resulted in discrimination in favor of those creditors whose interests were purchased by Daseke (because they were paid in full immediately, well prior to confirmation of the RTC's plan).

On its face, Section 1126(e) says nothing about blocking positions, and neither do the House or Senate Reports. In a recent law review article, however, authors Fortgang and Mayer point out that Section 203 of the Bankruptcy Act "explicitly referred to trading in claims and interests as a ground for finding bad faith." C. Fortgang and T. Mayer, *Trading Claims and Taking Control of Corporations in Chapter 11*, 12 Cardozo L.Rev. 1, 93 (1990) (hereinafter, Fortgang & Mayer).[5] Indeed, the Second Circuit ruled that acquiring claims to aid some interest other than that of strengthening one's position as a creditor could amount to bad faith for purposes of Section 203. *In re P-R Holding Corp.*, 147 F.2d 895, 897 (2d Cir.1945); *see also In re Allegheny International, Inc.*, 118 B.R. 282, 289 (Bankr.W.D.Pa.1990) (non-creditor with designs to take over company acquired claims, proposed plan, and then acquired

---

**5.** Section 203 read as follows:

> If the acceptance or failure to accept a plan by the holder of any claim or stock is not in good faith, *in the light of or irrespective of the time of acquisition thereof,* the judge may, after hearing upon notice, direct that such claim or stock be disqualified for the purpose of determining the requisite majority for the acceptance of a plan.

Bankruptcy Act of 1898, § 203, 11 U.S.C. § 603 (1976) (emphasis added). Bankruptcy Rule 10–305(d) superseded § 203 without substantive change:

> (d) *Disqualification of Acceptance or Rejection.* For purposes of determining the requisite number of acceptances, the court after hearing on notice to the creditors or stockholder may disqualify any acceptance or rejection of a plan or modification of a plan if such acceptance or rejection was not in good faith in *the light of or irrespective of the time of the acquisition of the claim or stock* by such creditor or stockholder.

Bankr.R. 10–305(d), 11 U.S.C. app. at 559 (Supp. V 1975) (repealed effective 1983) (emphasis added).

more claims to block confirmation of debtor's plan; blocking votes were disqualified as having been acquired in bad faith, under Section 1126(e)).

Section 1126(e) was drawn from Section 7–309(e) of the Commission Bill. Fortgang & Mayer, at 93; *see* Report of the Comm'n on the Bankruptcy Laws of the United States, H.R.Doc. 93–137, 93rd Cong., 1st Sess., pt. 2, at 250 (1973) (hereinafter Commission Report). The explanatory note in the Commission Report states that "[s]ubdivision (e) [of Section 7–309] is derived from § 203 of the present Act and proposed Rule 10–305(d)." Commission Report, at 251. The pedigree of Section 1126(e) thus supports the notion that votes arising from claims acquired for blocking purposes may be disqualified under Section 1126(e), just as they could be under Section 203 of the Bankruptcy Act. Fortgang & Mayer, *supra; see Advanced Chapter 11 Bankruptcy Practice* § 14.108 (Salerno et al. eds., J. Wiley & Sons 1991).[6]

■ The purchasing of claims by an affiliate or insider of the Debtor for the sole or principle purpose of blocking a competitor from purchasing such claims is an obstructionist tactic done in contemplation of gaining an unfair advantage over other creditors. Such conduct cannot, as a matter of law, be in good faith. *Young,* 324 U.S. at 210–11, 65 S.Ct. at 597–98; *see In re Allegheny Intern.,* 118 B.R. at 289; *In re P–R Holding Corp.,* 147 F.2d at 897. This court is unable to ascertain any independent, legitimate interest which would justify the purchase of these claims by Daseke than to obstruct the competing plan proponent. *In re Gilbert, Inc.,* 104 B.R. at 216. The sole purpose was to ensure the confirmability of their own plan, partly by locking in an affirming impaired class (though that effort foundered on Sec-

tion 1129(a)(10), as discussed earlier in this decision), and partly by blocking an acceptance by that same impaired class in the RTC's plan. That purpose will not withstand the "good faith" hurdle imposed by Section 1126(e).

The evil of an insider's acquiring a blocking position is especially insidious in the context of competing plans, as is the case here. The Code contemplates that, when two or more plans are before the court,

> The court may confirm only one plan.... If the requirements of subsections (a) and (b) of this section are met with respect to more than one plan, the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm.

11 U.S.C. § 1129(c). Thus, when the court is forced to make the choice under Section 1129(c), one of the groups that has input into the decision is the creditors. One may reasonably infer, from the structure of Section 1129 generally, that Congress had in mind the considerations of independent third parties when it directed courts to accede to the desires of creditors in Section 1129(c), rather than the wishes of an insider. When the debtor, in the context of competing plans, buys up blocking claims in an important "swing class" consisting of such independent third parties (whether directly or indirectly, as here), it is effectively stacking the deck on the Section 1129(c) issue, undercutting the ability of the court to properly "consider the preferences of creditors" as directed by the statute. *See In re Allegheny International, Inc.,* 118 B.R. at 299; *see also In re MacLeod,* 63 B.R. at 656 (competitor acquired blocking position for ulterior purpose of destroying or injuring the debtor, so that the interests

---

6. Salerno et al. caution that one could as easily argue that the failure of Congress to carry forward into Section 1126(e) the precise language of Section 203 may betray an intent *not* to continue the pre-Code law regarding purchasing blocking positions. *Id.* The general rule, however, is that a recodification of prior law will not repudiate case law arising under the prior law absent a clearly expressed intention to depart from prior law or judicial interpretations,

especially when the pre-Code practice reflects policy considerations of great longevity and importance. *Kelly v. Robinson,* 479 U.S. 36, 50, 107 S.Ct. 353, 361, 93 L.Ed.2d 216 (1986); *Midlantic National Bank v. New Jersey Dept. of Environmental Protection,* 474 U.S. 494, 500, 106 S.Ct. 755, 759, 88 L.Ed.2d 859 (1986); *see United States v. Ron Pair Enterprises,* 489 U.S. 235, 245, 109 S.Ct. 1026, 1032, 103 L.Ed.2d 290 (1989).

of its competing business would be furthered).

Sanctioning claims acquisition for purposes of blocking an opponent's plan would also ignite a scramble for votes conducted almost entirely outside the Code's carefully developed structure (plan, disclosure statement, equal treatment, regulated solicitation, court-supervised confirmation), leaving creditors to select not the best plan but the best deal they might be able to individually negotiate. Creditors would be paid, no doubt, but not equally, and not on the basis of accurate information. Such a wild free-for-all may appeal to the entrepreneurial capitalist, but it also issues a gilt-edged invitation to fraudulent and corrupt practices, to say nothing of the ramifications of buying claims in exchange for forbearance, a potential violation under the federal criminal code. *See* 18 U.S.C. § 152; *see also In re Featherworks Corp.*, 25 B.R. 634, 641 (Bankr.E.D.N.Y.1982). Needless to say, such an invitation cannot responsibly be issued by this court.

The argument that "we needed to do it to them before they did to us" is flawed in at least two respects. First, the conduct on the part of RTC could have earned similar condemnation and disqualification, for precisely the same reasons, i.e., their sole purpose, as the evidence indicated at the hearing, would have been to defeat the confirmability of Debtor's Plan. *See In re Federal Support Co.*, 859 F.2d at 19; *but see In re P–R Holding Corp.*, 147 F.2d at 897; *In re Gilbert, Inc.*, 104 B.R. at 216.[7] Second, such a rationale, if accepted, would no doubt become the favorite *excuse* to justify such tactics in the future. Courts would be forced into speculating about what some other party was "going to do." What

should a court do under such an inquiry if it determines that the debtor honestly held the fear, but that the fear was not justified? The question itself suggests the futility of such a legal standard.

Accordingly, pursuant to Section 1126(e), the votes cast by Daseke are disallowed for purposes of the RTC Plan as such votes were neither acquired nor voted in good faith.

Because Section 1126(e) effectively disposes of the issue, we need not address whether, independent of that section, the Daseke votes would be ignored for purposes of determining whether the unsecured class had voted for the RTC plan, nor need we decide whether the Daseke claims count as insider claims in the context of the RTC-proposed plan. 11 U.S.C. § 1129(a)(10).[8]

## CONCLUSION

For the foregoing reasons, confirmation of the Debtor's Plan may not proceed. Further, with the votes of Daseke in the unsecured trade class disqualified, the way is open to confirm the RTC's Plan. The motion of the RTC to strike the Debtor's Disclosure Statement is denied for the reasons stated in this opinion, though the loss of this battle also amounts to winning the war. The motion to strike the votes of the Debtor is sustained as to the RTC's plan, but denied as moot with respect to the Debtor's plan, because the votes will not count as a matter of law anyway, by virtue of Section 1129(a)(10).

---

7. Certainly Debtor's counsel would have no way of determining in advance how this court might rule on such an issue and their advice to purchase such claims would seem to be a proper method of handling the problem, given such uncertainty. In the future, such advice would be unwise. This is not to say, however, that there are never legitimate grounds for buying claims. Under the proper circumstances, the purchasing of claims may well be a legitimate tactic. What those legitimate grounds are is not presently before the court nor is the court inclined to embark on such a discussion.

8. As earlier noted (*see* Fortgang & Mayer), Section 1129(a)(10) directs the determination whether at least one impaired class has voted in favor of the plan to be made "… without including any *acceptance* of the plan by *any insider.*" 11 U.S.C. § 1129(a)(10) (emphasis added). The section leaves open (or forecloses, depending on one's point of view) the question of what to do with *rejections* of a plan by an *insider of the debtor* who is not an "insider" of the plan proponent. The court is pleased to be spared the challenging task of deciding this difficult question of statutory interpretation.