## In re KELLOGG SQUARE PARTNERSHIP, Debtor.

**Bankruptcy No. 3–92–5211.**

United States Bankruptcy Court, D. Minnesota, Third Division.

Oct. 22, 1993.

Michael L. Meyer, Ravich, Meyer, Kirkman & McGrath, Minneapolis, MN, for debtor.

Dennis J. Ryan, Stephen M. Mertz, Faegre & Benson, Minneapolis, MN, for Prudential.

GREGORY F. KISHEL, Bankruptcy Judge.

This Chapter 11 case came on before the Court on May 4, 1993, for hearing on the two motions of The Prudential Insurance Company of America ("Prudential") for orders permitting it to change certain ballots, previously filed in acceptance of the Debtor's plan of reorganization, to rejecting ballots. Prudential appeared by its attorneys, Stephen M. Mertz and Dennis J. Ryan. The Debtor appeared by its attorney, Michael L. Meyer. Upon the moving and responsive documents, the arguments of counsel, and other relevant pleadings and documents in the court file, the Court read findings of fact and conclusions of law on the record in disposition of the motions, pursuant to FED.R.CIV.P. 52(a) and

FED.R.BANKR.P. 9014. This memorandum order is entered to effectuate the Court's denial of the motions, and to evidence and supplement the rationale for the decision that was read onto the record at the hearing.[1]

The Debtor is a Minnesota general partnership. It filed a voluntary petition for reorganization under Chapter 11 on September 28, 1992. Prudential is its single largest creditor, and the only secured creditor treated under the plan of reorganization that the Debtor filed on March 5, 1993. In connection with that plan, the Debtor duly made disclosure pursuant to 11 U.S.C. §§ 1125(b)–(c), and solicited the acceptances of the creditors that comprised the classes specified under the plan.

Fifty-three creditors filed ballots in which they denominated themselves as members of Class III, the class of unsecured creditors. The Debtor and Prudential have stipulated that only 49 of these ballots should be considered in tallying the class's acceptance or rejection of the plan.[2] The motions at bar concern 12 of these ballots.[3] All of these ballots were timely cast by trade creditors of the Debtor; all were acceptances. Prudential approached all 12 claimants, however, and induced them to make an absolute trans-

---

**1.** Prudential made the motions at bar in conjunction with the proceedings on confirmation of the Debtor's plan of reorganization. Counsel argued them before the confirmation hearing was formally convened. Due to the composition of the Debtor's debt structure and the pattern of timely-cast creditors' ballots, these motions had to be decided before the parties could go on to make a record on confirmation-related issues. Had these motions been decided adversely to the Debtor, it would not have met 11 U.S.C. § 1129(a)(10), one of the threshold requirements for confirmation. The outcome of these motions, then, bore on whether the Debtor could even go forward into substantive issues under 11 U.S.C. §§ 1129(a)–(b). While it was incumbent on the Court to rule from the bench, the gravity and novelty of the issues merit a formal written decision to memorialize the ruling.

**2.** Of the four remaining ballots denominated as being in this class, two were cast on by Sentinel Management Company, an insider, and therefore are excluded from the tally by operation of 11 U.S.C. § 1129(a)(10). (Sentinel Management had cast one of these on account of its own claim, and one as assignee of the filed claim of Northern States Power Company.) The remain-

ing two were cast by parties whose pre-petition relationship with the Debtor sounds under an executory contract or unexpired lease within the contemplation of 11 U.S.C. § 365(a); the Debtor and Prudential have stipulated that the voting rights of those two claimants need not be taken into consideration for this motion.

**3.** The motions were served and filed in rapid succession; each concerns part of the total of 12 ballots. The voting creditors, and the amounts of the claims they asserted on the faces of their ballots, were:

| | |
|---|---|
| Sovia's Decorating and Painting, Inc. | $1,700.00. |
| LAW Engineering, Inc. | 5,625.92. |
| Tamarack Materials, Inc. | 39.25. |
| Cummins Diesel Sales, Inc. | 868.41. |
| Outbound Tours, Inc. | 90.00. |
| Maintenance and Construction Professionals | 3,312.50. |
| Metro Electrostatic Painting | 915.00. |
| Dey Appliance Parts | 839.72. |
| Budget Lighting, Inc. | 28.20. |
| A–1 Printers, Inc. | 175.84. |
| St. Paul Association of Building Owners ("SPABO") | 33.00. |
| Skyway Publications | 231.16. |

fer of their claims against the bankruptcy estate to Prudential. The consideration was full payment of the face amount of the claims, in cash. All 12 claimants executed instruments entitled "Assignment and Transfer Agreement" in Prudential's favor. In the case of 11 out of the 12 claimants, Prudential obtained the assignments after the claimants had cast their accepting ballots.[4]

Prudential brings these · motions under FED.R.BANKR.P. 3018(a),[5] and seeks permission to change the acceptances previously cast on account of these claims, to rejections. It candidly admits that its strategy is to defeat confirmation of the Debtor's plan at the stage of 11 U.S.C. § 1129(a)(10),[6] so as to prevent Prudential from even being subjected to the possibility of a "cramdown" treatment of its secured claim under 11 U.S.C. § 1129(b)(2)(A).[7] The Debtor, of course, vigorously opposes the motions.[8]

By its terms, the rule requires a showing of "cause" for leave to change previously-cast ballots. As to the sort of proof that will make out such "cause," a frequently-cited commentator has opined:

> The test for determining whether cause has been shown should not be a difficult

one to meet. As long as the reason for the vote change is not tainted, the change of vote should usually be permitted. The court must only ensure that the change is not improperly motivated.

> Examples of reasons for a change of vote might include a breakdown in communications at the voting entity; misreading the terms of the plan; or execution of the first ballot by one without authority. In short, the vote should be changed in order to allow the voting entity to intelligently express its will.

8 COLLIER ON BANKR., ¶ 3018.3[4], at 3018–10 (15th ed. 1990), as cited in *In re MCorp Financial, Inc.*, 137 B.R. 237, 238–239 (Bankr.S.D.Tex.1992). This suggestion of relative lenity is not an absolute, however. One of the few courts to actually pass on the issue more properly observed that "vote changing is the exception and not the rule," and that, upon a challenge, the proponent of the change must demonstrate its propriety. *In re Featherworks Corp.*, 36 B.R. 460, 462–463 (E.D.N.Y.1984).

■ Ultimately, these pronouncements can be reconciled. They both rest on three

---

4. In the case of SPABO, Prudential obtained the assignment under an instrument dated April 1, 1993. On April 13, 1993, SPABO filed an accepting ballot in its own right. (The holographic entry on this ballot identifies the name of the creditor as "St. Paul Bd MA." The Debtor and Prudential have tacitly acknowledged that these ballots and claims relate to the same original creditor, notwithstanding the variance in nomenclature.) On April 29, 1993, Prudential timely filed a rejecting ballot on account of the same claim, asserting the status of an assignee from SPABO. (Though Prudential claimed in one of its written motions that Skyway Publications had similarly cast a post-assignment ballot, it was wrong; the clerk received that claimant's own ballot on March 30, 1993, and the assignment is dated April 1, 1993.)

5. In pertinent part, this Rule provides:

> For cause shown, the court ·after notice and hearing may permit a creditor or equity security holder to change or withdraw an acceptance or rejection [of a plan of reorganization].

6. This statute requires the Debtor, as a threshold matter, to show that "at least one class of claims that is impaired under [its] plan has accepted the plan, determined without including any acceptance of the plan by any insider." Prudential

having rejected the plan in its status as the only member of Class II, and Classes I and IV being unimpaired under the plan, the Debtor's prospects for meeting § 1129(a)(10) stand or fall on Class III.

7. The wording and import of this statute, and its application to this case, are treated at length in today's separate order denying confirmation of the Debtor's plan.

8. It does so with good reason. 11 U.S.C. § 1126(c) requires, as one of two elements of acceptance by a class of creditors, that accepting ballots be cast by the holders of claims that total, in amount, at least two-thirds of the total of the amounts of the claims voted by class members. As acknowledged by the parties in ¶¶ 16 and 17 of a Stipulation of Facts filed on May 14, 1993, a swing of the ballots in question from acceptances to rejections would significantly contribute to reducing the acceptance by Class III claimants to less than this quantum. Class III was the only unimpaired non-insider class that could enable the Debtor to satisfy § 1129(a)(10). (Prudential, as the member of Class II, rejected the plan.) A loss on these motions then, might have put the Debtor into the more difficult and problematic position of having to prove up cramdown as to both its secured and unsecured creditors.

tacit propositions, all borne out by the Bankruptcy Code and its legislative history:

1. To ensure certainty in the confirmation process, creditors must commit themselves to accept or reject a plan by the unequivocal means of casting a ballot, by a fixed date.

2. As a general rule, creditors should be given the full benefit of their right of franchise under Chapter 11, so long as they complied in the first instance with the ministerial rules governing that exercise.

3. Where a creditor that has already voted shows that its cast ballot did not reflect the contemporaneous intention of the holder of the voting claim, the record of votes should be corrected. Otherwise, giving effect to the erroneously-cast ballot would defeat the right of franchise.

The last proposition, of course, implicates many of the same considerations as are relevant in passing on a request for the reformation of a contract, under nonbankruptcy law. The central fact question is the state of the voting creditor's intent as to its options on a plan, at the time when it was required by statute to elect among those options by casting its ballot.

■ When the requisite "cause," is thus identified, it is clear that Prudential cannot be allowed to change 11 out of the 12 ballots. The only "cause" it alleges is that "Prudential, as the owner of the Claims[,] would not have voted the Claims in favor of the Plan ..." On this basis, it argues that it should be permitted to change the ballots "because the ballots filed by the Claimants do not intelligently express *Prudential's* will with respect to the plan ..." (emphasis added). This theory, however, fails to recognize a controlling legal aspect of the substantive backdrop for these motions, which ends up defeating the way in which Prudential engineered them:

As a general rule, an entity which acquires a claim [against a bankruptcy estate] steps into the shoes of that claimant, enjoying both the benefits and the limitations of the claim, as a successor in interest.

*In re Applegate Property, Ltd.*, 133 B.R. 827, 833 (Bankr.W.D.Tex.1991) (citing *In re Covington Grain Co., Inc.*, 638 F.2d 1357, 1361 (5th Cir.1981) and *Carnegia v. Georgia Higher Education Assistance Corp.*, 691 F.2d 482, 483 (11th Cir.1982)). Where an entity acquires a creditor's claim *after* the creditor has already cast a vote on a plan of reorganization, the assignor-creditor's evidenced commitment to that specific participation in the case is a permanent, binding limitation on the transferred claim.

A procedural consideration more specific to the remedy of bankruptcy reorganization also merits limiting the grounds for vote-changing to those akin to the recognized basis for reformation of contracts. The process by which creditors respond to the solicitation of a plan proponent must be concluded in a fixed and objective fashion, or there would be no certainty in the dynamics of reorganization under Chapter 11. This dictate is implied by both the Bankruptcy Code and the basic tenets of the adjudicative process. It would be seriously undercut if a post-vote change in the identity of the holder of a claim, and that alone, were considered as "cause" for a grant of leave to change a ballot. As the *Applegate Property* court phrased it in a different context, were pre-transfer votes not binding on the assignees of claims, creditors would be left "to select not the best plan [of reorganization] but the best deal they might be able to individually negotiate," with the major constituencies vying for control of the case, behind the scene of the confirmation process. 133 B.R. at 836. *Cf. In re Featherworks Corp.*, 36 B.R. at 463 ("... the Court does not believe that the law countenances vote trafficking and assertedly otherwise innocent self-dealing *after the votes have been cast* ...") (emphasis in original)[9].

■ This conclusion does not leave the acquiring entity completely bereft of options. It is still open to an acquiring entity under

---

9. The *Featherworks* courts made this pronouncement in its treatment of a challenge to a motion for change of votes as having been the result of bad-faith strategizing on the part of the transfer- or-claimant and the transferee-movant. This, of course, is an issue different from the one at bar— but the underlying thought is the same.

these circumstances to demonstrate that the ballots in question, as they were originally cast, did not reflect the true intentions *of the parties that cast them, when they cast them.* Prudential has not adduced any evidence to this effect, as to any of the 11 ballots in controversy.[10] Since it has not, it is not entitled to a grant of leave to change these 11 ballots as it—now, from its own perspective, and solely in its own interests—would choose to vote them.[11]

Prudential is allowed to change the ballot cast by SPABO on April 13, 1993, however, for the reason contemplated by the authorities cited—it did not reflect the true will of the entity that held the claim when the ballot was filed—and for another, simpler one— SPABO simply no longer had the right or standing to cast a ballot.

IT IS THEREFORE ORDERED:

1. That Prudential's motions for leave to change ballots are denied, as to all of the subject ballots other than that cast by SPA-BO.

2. That, other than the ballot cast by SPABO, the ballots identified in n. 3 of this order shall stand as acceptances of the Debtor's plan, and shall be tallied as such.

3. That ballot no. 32, cast under the name of "St. Paul Bd MA" on April 13, 1993, is stricken. Ballot no. 64, cast by Prudential as an assignee of "St. Paul Assoc. of Bldg. Owners" on April 29, 1993, shall be tallied as a rejection by a member of Class III under the Debtor's plan.

---

10. *I.e.*, all of the 12 other than SPABO's.

11. Since this analysis is determinative of Prudential's motions, it is not necessary to address the Debtor's alternative theories for denial of the motions: that Prudential acted in bad faith throughout this series of events and transactions; and that any substitute ballot cast by Prudential should not be given effect to the extent that it was filed within the 20-day period during which the transferor of the underlying claim had the right to object to the transfer under Fed. R.Bankr P. 3001(e)(2).