FILED

JUN 27 2012

SUSAN M SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**ORDERED PUBLISHED**

## UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: ) | BAP No.   NV-11-1728-DKiPa |
| ) | NV-11-1737-DKiPa |
| WINDMILL DURANGO OFFICE, LLC, ) | (Related appeals) |
| ) | |
| Debtor. ) | Bk. No.   10-25594-lbr |
| _____ ) | |
| ) | |
| BEAL BANK USA, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | **O P I N I O N** |
| ) | |
| WINDMILL DURANGO OFFICE,  LLC;) | |
| UNITED STATES TRUSTEE; DP AIR ) | |
| CORPORATION, ) | |
| ) | |
| Appellees. ) | |
| _____ ) | |

Argued and Submitted on June 15, 2012
at Las Vegas, Nevada

Filed – June 27, 2012
Ordered Published – July 6, 2012

Appeal from the United States Bankruptcy Court
for the District of Nevada

Honorable Linda B. Riegle, Bankruptcy Judge, Presiding

Appearances:     Jeffrey R. Sylvester of Sylvester & Polednak, Ltd.
                 argued for Appellant Beal Bank USA.  Shara Larson
                 of Marquis Aurbach Coffing argued for Appellee
                 Windmill Durango Office, LLC.

Before:  DUNN, KIRSCHER and PAPPAS, Bankruptcy Judges.

DUNN, Bankruptcy Judge:

Beal Bank USA ("Beal Bank") appeals two of the bankruptcy court's orders concerning the chapter 11 plan of the debtor, Windmill Durango Office, LLC.[1] Specifically, Beal Bank appeals the bankruptcy court's order ("ballot order") denying its motion to permit it to change a ballot accepting the debtor's chapter 11 plan ("ballot motion").[2] Beal Bank also appeals the bankruptcy court's order confirming the debtor's chapter 11 plan ("plan confirmation order") over Beal Bank's objection. We AFFIRM the bankruptcy court's rulings in both appeals.

**FACTS**

A.    The debtor's prepetition history

The debtor owns 4.49 acres of commercial real estate developed with a Class A office building ("real property"). The

---

[1] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

[2] Beal Bank has two related appeals before us: NV-11-1737 and NV-11-1728. The first appeal, NV-11-1737, involves the ballot order. The second appeal, NV-11-1728, involves the plan confirmation order.

Beal Bank and the debtor submitted briefs and records in each appeal. We refer to Beal Bank's opening and reply briefs in the first appeal as "Appellant's Ballot Motion Opening Brief" and "Appellant's Ballot Motion Reply Brief," respectively. We refer to Beal Bank's opening and reply briefs in the second appeal as "Appellant's Plan Confirmation Opening Brief" and "Appellant's Plan Confirmation Reply Brief," respectively.

We refer to the debtor's brief in the first appeal as "Appellee's Ballot Motion Brief." We refer to the debtor's brief in the second appeal as "Appellee's Plan Confirmation Brief."

real property is valued at $18.99 million.

The debtor leases most of the office building space to Allegiant Air ("Allegiant").[3] Allegiant is a national airline company, running its corporate headquarters out of the leased office building space. It is the debtor's primary tenant, occupying 87% of the office building and providing 95% of the real property's revenue.

Under the lease, Allegiant pays a monthly rent of $182,006.12, including common area maintenance expense ("CAM") and parking. Allegiant's lease began in April 2008 and ends in April 2018. Allegiant may exercise an option to terminate the lease in April 2015. According to the debtor, if Allegiant exercises this option, it must pay the debtor an estimated $1.2 million cancellation fee.

The debtor purchased the real property prepetition through a loan with Community Bank of Nevada and Colonial Bank (collectively, "original lenders"). To document the loan, the debtor executed a promissory note in the original principal amount of $16.5 million, secured against the real property.[4]

The original lenders later were closed down and placed into receivership with the FDIC. Until that time, the debtor was current on loan payments. The debtor tried to negotiate a purchase of the loan from the FDIC. During negotiations with the

---

[3] The debtor also leases a small office space to 1-800-Registry, which entered into a short-term lease with the debtor in October 2010.

[4] The promissory note matured by its non-accelerated terms on December 26, 2011.

FDIC, the debtor defaulted on the loan.[5]  The FDIC ultimately sold the loan to Beal Bank.

On April 1, 2010, Beal Bank commenced a state court action against the debtor for breach of contract ("state court action"). It also sought and eventually obtained the appointment of a state court receiver.  Beal Bank recorded a notice of default and election to sell on April 9, 2010.

B.    The debtor's chapter 11 bankruptcy case

1.    The changing kaleidoscope of unsecured claims

The debtor filed its single asset real estate chapter 11 bankruptcy petition on August 17, 2010.  Windmill Durango, LP is the sole owner of the debtor.

The debtor scheduled $1,121,261.11 in loans owed by Windmill Durango, LP, and $168,000 in loans owed by Windmill Durango Office II, LLC as accounts receivable.  It also scheduled $99,844.79 in past due rent and CAMs owed by Allegiant as an account receivable.[6]

The debtor scheduled Beal Bank as its only secured creditor. The debtor initially reported a total of $268,000 in unsecured nonpriority claims in its original Schedule F; Windmill Durango Office II, LLC held the largest unsecured nonpriority claim in the amount of $265,000.  The debtor specified the amount of only one other unsecured nonpriority claim: a $3,000 business expense

---

[5] According to Beal Bank, the debtor failed to make payments from September 2009 to March 2010.

[6] Allegiant's debt arose from a state court order requiring Allegiant to pay this amount to the receiver for the debtor's benefit.

4

owed to Green Thumb Maintenance. The debtor listed the remaining unsecured nonpriority claims in "unknown" amounts. The debtor named DP Air Corp. and Otis Elevator Company among the creditors holding unsecured nonpriority claims in unknown amounts. It also reported in its Schedule H executory contracts with DP Air Corp. and Otis Elevator Company.

The debtor amended its Schedule F three times over the course of its bankruptcy case.[7] In the first amended Schedule F, the debtor reduced Windmill Durango Office II, LLC's unsecured nonpriority claim to $32,000. In the second amended Schedule F, the debtor listed Marquis & Aurbach with a $6,835.02 unsecured nonpriority claim for prepetition attorney fees incurred in the state court action. In the third amended Schedule F, the debtor listed John Benedict, Esq. ("Benedict") with a $1,520 unsecured nonpriority claim for prepetition attorney fees incurred from representing the receiver in the state court action.

The deadline for general creditors to file proofs of claim was January 5, 2011 ("claims bar date"). Otis Elevator Company, DP Air Corp., Marquis & Aurbach and Benedict filed proofs of claim, all of which were unsecured nonpriority claims based on services performed for the debtor. Otis Elevator Company and DP Air Corp. timely filed their proofs of claim. The two remaining creditors filed their proofs of claim some weeks after the claims bar date; Marquis & Aurbach filed its proof of claim

---

[7] The debtor filed the first amended Schedule F on September 23, 2010 (docket no. 40), the second amended Schedule F on February 3, 2011 (docket no. 89) and the third amended Schedule F on March 24, 2011 (docket no. 125).

5

on March 1, 2011, and Benedict filed his original proof of claim on March 21, 2011, and his amended proof of claim on April 1, 2011.

The total amount of the unsecured nonpriority claims filed was $14,673.12. Otis Elevator Company filed two proofs of claim; the first was in the amount of $1,500 and the second was in the amount of $648.59. DP Air Corp.'s proof of claim was in the amount of $4,506.20. Marquis & Aurbach's proof of claim was in the amount of $6,498.33. Benedict's proof of claim was in the amount of $1,520.[8]

2. The debtor's disclosure statement

The debtor filed its original disclosure statement and plan on January 26, 2011. An amended disclosure statement and amended plan were filed on March 16, 2011. Although Beal Bank objected to the original disclosure statement, it did not object to the amended disclosure statement.

Under the amended disclosure statement, the debtor placed Beal Bank into Class 1 and the unsecured nonpriority creditors into Class 3. It estimated Beal Bank's total secured claim to be $16,188,110.62. It believed that the real property had $3 million in equity based on an appraised value of $19.4 million.[9] The debtor pointed out that Beal Bank never

_____

[8] Benedict filed two proofs of claim, claim no. 6 and claim no. 7. Claim no. 7 amended claim no. 6.

[9] The debtor stated in the amended disclosure statement that the real property was valued at $19.4 million. In the third amended plan filed on December 19, 2011, see infra n. 11, the
(continued...)

6

disputed the appraised value of the real property. It further noted that Beal Bank was over-secured, given the appraised value of the real property and the amount of its secured claim.

The debtor proposed paying Beal Bank a total principal amount of $16,188,100.62, fully amortized over 30 years with 2.75% interest. It proposed paying $66,086.53 per month, with the balance of the unpaid principal of $12,189,347.85 due and payable in ten years. The debtor would make a final balloon payment on the unpaid principal balance.

The debtor intended to refinance or sell the real property in order to make the proposed balloon payment. It believed that the real property's value would increase over ten years. Even if the real property's value remained the same, the debtor estimated that there would be 40% in equity built up at the end of the plan's ten-year term.

The debtor also proposed to pay 100% of the allowed claims of the unsecured nonpriority creditors without interest ninety days after entry of the plan confirmation order.

Following hearings on March 9, 2011, and March 30, 2011, the bankruptcy court entered an order approving the amended disclosure statement ("disclosure statement order") on April 5, 2011. The bankruptcy court set May 31, 2011, as the deadline by which creditors were required to submit their ballots accepting

[9](...continued)
debtor iterated this value. At the December 13, 2011 hearing, the bankruptcy court found that the real property was "worth as all concede at a minimum of $18.99 million." Tr. of December 13, 2011 hr'g, 5:18-19.

or rejecting the plan ("ballot deadline").

### 3. Beal Bank's ballot motion

Beal Bank, Marquis & Aurbach and Benedict timely submitted their ballots. Beal Bank voted to reject the plan, but Marquis & Aurbach and Benedict voted to accept the plan. Two and a half weeks before the ballot deadline, Otis Elevator Company and DP Air Corp. withdrew their respective proofs of claim.[10]

One week before the ballot deadline, Beal Bank filed an "Unconditional Transfer and Assignment of Claim After Proof of Claim Filed" ("claim transfer"). Beal Bank disclosed in the claim transfer that Benedict assigned his claim to Beal Bank in exchange for $1,250.

Three days after filing the claim transfer, Beal Bank filed the ballot motion. In the ballot motion, it sought the bankruptcy court's permission to withdraw Benedict's vote accepting the plan and submit a substitute ballot rejecting the plan under Rule 3018(a).

Beal Bank admitted that it purchased Benedict's claim in order to block plan confirmation, as the debtor was seeking cramdown under § 1129(b)(2)(B). It noted that if the bankruptcy court allowed Beal Bank to withdraw Benedict's ballot and change the vote, the debtor could not use cramdown under the plan, as it would have no consenting impaired class as required under § 1129(a)(10).

Beal Bank averred that its purchase of Benedict's claim as a

---

[10] Otis Elevator Company withdrew its proof of claim on May 10, 2011, and DP Air Corp. withdrew its proof of claim on May 13, 2011.

8

means to block plan confirmation did not constitute bad faith. It asserted that it had no improper motivation in wanting to withdraw Benedict's ballot voting to accept the plan. Rather, Beal Bank simply wanted to protect its own claim. It also pointed out that it sought to withdraw Benedict's ballot and change the vote before the ballot deadline.

The debtor opposed the ballot motion, arguing that Beal Bank failed to satisfy Rule 3018(a). Rule 3018(a) requires that a creditor must show cause to change or withdraw an acceptance or rejection of the plan. The debtor contended that Beal Bank failed to show cause for withdrawing acceptance of the second amended plan. Instead, Beal Bank merely stated that it was trying to protect its interest and that it was making the change before the ballot deadline.

The debtor cited In re Kellogg Square P'ship, 160 B.R. 332 (Bankr. D. Minn. 1993), for the proposition that a bankruptcy court usually allows a creditor to change its vote as long as the creditor's reason for the change is not improperly motivated. If the creditor's proposed change is challenged, it must demonstrate the propriety of the change. According to the debtor, in Kellogg Square P'ship, the bankruptcy court determined that where an entity acquires a creditor's claim after the creditor voted to accept or reject the plan, the assigning creditor's "evidenced commitment to that specific participation in the case is a permanent, binding limitation on the transferred claim." Id. at 335. Here, Beal Bank did not provide any evidence indicating that Benedict's vote accepting the second amended plan was contrary to his true intention.

9

At the June 13, 2011 hearing on the ballot motion, Beal Bank again admitted that it sought to change Benedict's vote "so it could block confirmation inasmuch as the debtor would not be able to meet the numerosity requirements to have a consenting impaired class." Tr. of June 13, 2011 hr'g, 5:11-14. See also Tr. of June 13, 2011 hr'g, 6:8-10. It also admitted that it knew that Benedict had voted to accept the second amended plan at the time it purchased his claim and that it had purchased Benedict's claim after he voted. Beal Bank claimed, however, that there was nothing "untoward . . . in its efforts to obtain a blocking vote." Tr. of June 13, 2011 hr'g, 6:11-12. Beal Bank argued that simply because its purpose in changing the vote was self-motivated did not mean that it was improperly motivated.

Quoting Kellogg Square P'ship, Beal Bank further contended that "creditors should be given the full benefit of the right of franchise under Chapter 11 so long as it complied in the first instance with the ministerial rules governing that exercise." Tr. of June 13, 2011 hr'g, 15:13-15. Benedict complied with the disclosure statement order by timely casting his vote, so he should be given the full benefit of his right of franchise to change his vote, especially if he did so before the ballot deadline. Beal Bank argued that the fact that Benedict assigned his claim to Beal Bank was of no import. As successor-in-interest, Beal Bank also should be able to exercise the right of franchise to change the vote accepting the second amended plan.

The bankruptcy court denied Beal Bank's ballot motion, determining that Beal Bank did not show cause for changing or withdrawing Benedict's vote. It opined that cause "can't merely

be I want to change my mind or else why [did Rule 3018(a)] use the word 'cause'?" Tr. of June 13, 2011 hr'g, 16:17-18. See also Tr. of June 13, 2011 hr'g, 16:21-23 ("cause include[d] something other than I've changed my mind or else you don't need the word 'cause' [in Rule 3018(a)]."). The bankruptcy court determined that cause could not "be shown by the fact that [Beal Bank] want[ed] to block confirmation." Tr. of June 13, 2011 hr'g, 20:7-8. The bankruptcy court opined that it was not "appropriate [for creditors] to wait 'til the plans [were] balloted and then decide what claims [they were] going to buy." Tr. of June 13, 2011 hr'g, 20:9-10.

The bankruptcy court moreover reasoned that "it [did] the process violence by the buying of a claim to specifically block confirmation after [the balloting was done]." Tr. of June 13, 2011 hr'g, 20:21-24, 21:3-4.

The bankruptcy court entered the ballot order, which incorporated the fact findings and legal conclusions orally made on the record at the June 13, 2011 hearing. Beal Bank timely appealed the ballot order.

### 4. The debtor's plan confirmation

The debtor filed its second amended plan on April 6, 2011.[11] The second amended plan repeated the terms set forth in the

---

[11] The debtor titled the second amended plan as "Windmill Durango Office, LLC's [Proposed] Chapter 11 Plan of Reorganization." It filed a third amended plan on December 19, 2011, following hearings on July 7, 2011, and December 13, 2011. The debtor titled the third amended plan as "Windmill Durango Office, LLC's Second Amended Chapter 11 Plan of Reorganization."

11

amended disclosure statement.[12]

Beal Bank objected to the second amended plan ("plan objection"), arguing that the debtor did not satisfy the requirements of § 1129(a) and (b). It noted that the debtor proposed a nonconsensual cramdown plan, which required the debtor to satisfy all applicable elements of § 1129(a) and (b). It contended that the debtor failed to satisfy §§ 1129(a)(10) and 1126(c) which require at least one impaired class to accept the plan and for that impaired class to accept a plan by creditors holding 2/3 in the allowed claim amount and more than 1/2 in the number of allowed claims. It pointed out that the debtor only had two impaired classes: Beal Bank formed one impaired class and Maquis & Aurbach and Benedict formed the other impaired class ("unsecured nonpriority creditor class"). Beal Bank voted to reject the second amended plan. It also acquired Benedict's claim "for the express purpose of controlling the unsecured class vote." Thus, even if Marquis & Aurbach voted to accept the plan, Beal Bank argued, the debtor did not have the requisite number of consenting creditors under § 1126(c). Without a consenting impaired class, the debtor could not use the cramdown provisions of § 1129(b) to confirm its second amended plan.

Beal Bank contended that the debtor also failed to satisfy § 1129(a)(3) because it did not file the second amended plan in

[12] Beal Bank filed a proof of claim in the amount of $16,979,353. At the time of plan confirmation, it contended the amount of its secured claim was $17,404,669.85. The debtor countered that the amount of Beal Bank's secured claim was $16,188,110.62.

12

good faith, as it artificially impaired the unsecured nonpriority creditor class. Although the claims of the unsecured nonpriority creditor class only totaled $8,018.33 and sufficient operating cash was available to pay them, the debtor nonetheless proposed to pay the unsecured nonpriority creditor class without interest after ninety days. Beal Bank contended that the debtor purposely impaired the unsecured nonpriority creditor class to force the second amended plan upon Beal Bank, the only truly impaired creditor.

Beal Bank also objected to the proposed interest rate to be paid on its secured claim as it did not provide sufficient value. Under Till v. SCS Creditor Corp., 541 U.S. 465 (2004), the appropriate rate of interest is the prime rate plus a 1% to 3% adjustment for risk factors. Here, the debtor proposed paying Beal Bank 2.75% interest on its secured claim, even though the prime rate of interest was 3.25% at the time. The interest rate proposed by the debtor therefore fell below the minimum established by Till.

Beal Bank further argued that the debtor's second amended plan was not feasible as required under § 1129(a)(11). The debtor primarily relied on the rental income from its lease with Allegiant to fund the second amended plan. If Allegiant exercised its option to terminate the lease early, the debtor would be unable to continue business operations and fund the second amended plan. Beal Bank moreover questioned the debtor's ability to make the proposed balloon payment in ten years, given that the debtor did not provide any information regarding the probability of refinancing.

13

The debtor filed its ballot summary on June 14, 2011. It reported that the sole creditor in class 1, Beal Bank, voted to reject the second amended plan. The debtor further reported that both Marquis & Aurbach and Benedict voted to accept the plan.

The debtor also filed a reply to Beal Bank's plan objection. It noted in its reply that it would amend the plan to provide an appropriate rate of interest consistent with its expert witness testimony, to the extent that the bankruptcy court found that the proposed interest rate on Beal Bank's secured claim was inappropriate for cramdown purposes.

The debtor argued that it did not file the second amended plan in bad faith because it had economic and business justifications for not paying the unsecured nonpriority creditors preconfirmation. It claimed that it needed to have significant cash reserves to maintain Allegiant's office space, as Allegiant required the office space to be fully functional 24 hours a day, 7 days a week. It also needed significant cash reserves to pay for any maintenance and repair for the office building's equipment and utilities.

The debtor further explained it needed cash reserves following tax season and any CAM reconciliation disputes with Allegiant. It also needed cash reserves to make any tenant improvements, should it secure a new tenant.

The debtor pointed out that Beal Bank would receive substantially more through the second amended plan than through any other available alternative. Under the second amended plan, Beal Bank would receive deferred cash payments totaling the allowed amount of its claim plus interest while retaining its

14

lien on the real property.

As to Beal Bank's argument regarding feasibility, the debtor purposely chose to pay $66,086 per month to Beal Bank so it could save the difference between its monthly operating budget and the monthly rents to continue funding the plan in the event Allegiant terminated its lease early. As noted above, the debtor would be entitled to a $1.2 million cancellation fee if Allegiant terminated the lease early.

The debtor also anticipated that in ten years, the real property would be encumbered by less debt, the economy would have improved, and the real property's value would have increased. Even if the real property's value remained stagnant, approximately 35 to 40% of the real property's value would provide an equity cushion for the debtor.

With respect to Beal Bank's argument regarding the proposed interest rate on its secured claim, the debtor offered to adjust it to 4.25%. It revealed that, in light of the ballots submitted and objections filed, its expert witness, Kenneth Funsten ("Funsten") believed that the second amended plan should be assessed under Till. Even at the 2.75% interest rate, the second amended plan proposed to pay Beal Bank over $20 million in principal and interest over ten years, which exceeded the present value of Beal Bank's secured claim.

Two days before the July 7, 2011 evidentiary hearing on the second amended plan ("evidentiary hearing"), the debtor and Beal Bank filed a joint pretrial statement (docket no. 222). In the joint pretrial statement, the debtor and Beal Bank presented the following issues to be determined by the bankruptcy court at the

15

evidentiary hearing: (1) whether an impaired class existed with a genuine interest to consent to the second amended plan; (2) whether the debtor filed the second amended plan in good faith; (3) whether the second amended plan sets forth the appropriate interest rate on Beal Bank's secured claim for the purposes of cramdown; and (4) whether the second amended plan was feasible.

At the start of the evidentiary hearing, the bankruptcy court found that at least one impaired class (i.e., class 3, the unsecured nonpriority creditor class) had accepted the debtor's second amended plan. Relying on Conn. Gen. Life Ins. Co. v. Hotel Assocs. of Tucson (In re Hotel Assocs. of Tucson), 165 B.R. 470 (9th Cir. BAP 1994), it held that the debtor satisfied the requirement of § 1129(a)(10), though it acknowledged that the issue of class gerrymandering might be relevant to the issue of good faith under § 1129(a)(3).

The bankruptcy court heard testimony from various witnesses, including the debtor's expert witnesses, on the appropriate interest rate to be paid on Beal Bank's secured claim and the value of the real property. During the evidentiary hearing, the bankruptcy court emphasized that the second amended plan's feasibility depended on a determination of the appropriate interest rate to be paid on Beal Bank's secured claim.

At the end of the evidentiary hearing, the bankruptcy court asked the parties to submit supplemental briefs as to the second amended plan's feasibility. The parties were to include calculations of the potential monthly payment amounts and the balloon payment amount, based on the interest rates and the

16

amounts of Beal Bank's secured claim as advanced by each of the parties. The debtor and Beal Bank both filed their supplemental briefs on September 19, 2011 (docket nos. 254 and 255).[13]

The debtor contended in its supplemental brief that the second amended plan was feasible if the bankruptcy court accepted any of the interest rates proposed by the debtor. The debtor claimed that the appropriate interest rate was 4.25%, the Till build-up rate. But even at the highest interest rate of 4.79%, the blended rate, or at 4.52%, the average of the Till build-up rate and the blended rate, the debtor's second amended plan still was feasible. Applying any of these interest rates to the higher claim amount of $17,404,669.85 asserted by Beal Bank, the debtor noted that the calculated monthly payments were close to the $88,047 monthly adequate protection payment it had been making to Beal Bank over the course of the bankruptcy case. The debtor calculated that the monthly payment to Beal Bank would be $85,620.51 at the 4.25% interest rate, $88,393.86 at the 4.52% interest rate or $91,211.10 at the 4.79% interest rate.[14]

The debtor also anticipated that it would be able to make the balloon payment at the end of the plan term. The debtor

---

[13] Beal Bank included in the record before us a copy of the debtor's supplemental brief, but did not include a copy of its own supplemental brief. We obtained a copy of Beal Bank's supplemental brief from the bankruptcy court's electronic docket. See O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.), 887 F.2d 955, 957-58 (9th Cir. 1988); Atwood v. Chase Manhattan Mortg. Co. (In re Atwood), 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

[14] The debtor continued to maintain, however, that the amount of Beal Bank's secured claim was $16,188,110.62.

17

asserted that it would have $6 million in equity to work with at the end of the plan term, based on its proposed payoff schedule and the assumption that the real property's market value remained static. The debtor therefore believed that it would be able to refinance successfully or sell the real property to satisfy the balloon payment.

Beal Bank argued that the appropriate interest rate was 8.1%, the blended rate, as calculated by its own expert, Daniel Van Vleet ("Van Vleet"). Applying this interest rate to the $17,404,669.85 claim amount asserted by Beal Bank, the monthly payment amortized over thirty years would be $128,925. Even at the $16,188,111 claim amount asserted by the debtor, Beal Bank calculated that the monthly payments amortized over thirty years would be $119,913.

Beal Bank pointed out that the debtor's proposed loan term was ten years, maturing in 2021. If Allegiant early terminated its lease in April 2015 or continued with the lease to the end of its contracted term in April 2018, the debtor's cash flow potentially would be severely restricted well before the proposed loan maturity date. According to Beal Bank, the debtor did not provide any evidence that it could continue to service the debt obligation to Beal Bank following early termination or termination of the lease with Allegiant. Thus, Beal Bank concluded, the debtor's second amended plan was not feasible.

On December 13, 2011, the bankruptcy court held a hearing, orally issuing its fact findings and legal conclusions on the record. The bankruptcy court made detailed fact findings as to feasibility under § 1129(a)(11). With respect to the issue of

18

good faith under § 1129(a)(3), the bankruptcy court stated that "the [second amended] plan meets all the other requirements of Chapter 11 . . . ." Tr. of December 13, 2011 hr'g, 15:3-4. See also Tr. of December 13, 2011 hr'g, 4:3-4.

The bankruptcy court found that the 4.52% interest rate testified to by the debtor's expert was the appropriate cramdown interest rate. It adopted the 4.52% interest rate in light of the approach set forth by Till, which required the bankruptcy court to start with the prime rate and then build up or add to it based on risk factors. The bankruptcy court opined that Till only set 1% to 3% as the general range for risk factors, not as the limit.

The bankruptcy court adopted the findings set forth by Funsten, the debtor's expert, agreeing with his analysis of the risk factors. It adopted his conclusions "based upon the character of the loan, the fact that . . . [there was] a building that's rented, a stable tenant, and the rent above market and above the amount needed to pay the debt, the collateral which again relate[d] to the building, and the circumstances peculiar to this debtor." Tr. of December 13, 2011 hr'g, 13:15-20. The bankruptcy court explained that it adopted the 4.52% interest rate "to account for the high risk if the debt [was] equal to [Beal Bank's] current claim." Tr. of December 13, 2011 hr'g, 13:24-25, 14:1.

It found Van Vleet's calculation of the interest rate to be flawed in several respects. The bankruptcy court determined that Van Vleet used a coerced-loan approach, not the blended-rate approach he claimed to have used. It moreover found that he

19

"double-calculated" the risk to Beal Bank under the plan, applying an equity investor rate.

The bankruptcy court determined that the second amended plan was feasible based on the 4.52% interest rate proposed by the debtor and the $17,404,669.85 claim amount asserted by Beal Bank. The bankruptcy court was careful to note that it was assuming the higher claim amount without deciding, "[f]or the purposes of determining the appropriate rate of interest which, in turn, require[d] an analysis based upon the amount of the debt[.]" Tr. of December 13, 2011 hr'g, 4:11-14.

The bankruptcy court also found it reasonably possible that the second amended plan was feasible because the debtor had sufficient income to fund it as the debtor received rental income exceeding the monthly payment amount to Beal Bank and would receive substantial damages from Allegiant in the event of early lease termination. The bankruptcy court believed it unlikely that Allegiant would early terminate the lease, given relocation costs and the special features offered by the office building. The bankruptcy court further reasoned that even if Allegiant did not renew the lease in April 2018, the debt to Beal Bank would be reduced to $15,153,193.

It also recognized that the debtor had been making payments to Beal Bank in an amount equal to or close to the amount proposed under the second amended plan. The bankruptcy court further noted that the debtor's most recent operating report revealed that the debtor had a healthy cash balance.

The bankruptcy court found it reasonably possible that the debtor would be able to sell or refinance the real property such

20

that it would be able to make the balloon payment at the end of the ten-year plan term. The bankruptcy court determined that Funsten's report provided evidence as to the feasibility of a sale or refinance of the real property. It further determined that there was "nothing to suggest that the subject [real] property [would] decline in value," though it acknowledged that "any attempts to opine on the market conditions may be pure speculation with respect to the state of the economy and the market [in the area] in ten years[.]" Tr. of December 13, 2011 hr'g, 8:1-5. The bankruptcy court thus concluded that Beal Bank not only had an equity cushion at the time of the evidentiary hearing, but would have an even greater one in ten years because the debtor would have made payments under the second amended plan.

The bankruptcy court entered the plan confirmation order on December 21, 2011. Beal Bank timely appealed the plan confirmation order.

At oral argument, it was reported that the general unsecured claims had been paid in full, and payments to Beal Bank under the confirmed plan were current.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(L) and (O). We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

(1) Did the bankruptcy court err in denying Beal Bank's ballot motion?

(2) Did the bankruptcy court err in confirming the debtor's

21

second amended plan by finding that the debtor demonstrated that it was feasible?

(3) Did the bankruptcy court err in confirming the debtor's second amended plan by finding that the debtor filed it in good faith?

## STANDARDS OF REVIEW

The debtor and Beal Bank initially disagreed as to the standard of review that we should apply in reviewing the bankruptcy court's ruling under Rule 3018(a). At oral argument, counsel for the debtor agreed with Beal Bank that we should conduct our review under the abuse of discretion standard.

We have been unable to locate authority within the Ninth Circuit and elsewhere directly addressing this issue. We further note that the Bankruptcy Code does not define "cause." We nonetheless agree with the parties that the abuse of discretion standard of review applies here, as, within the context of chapter 11 cases, this standard of review has been applied to dismissals of chapter 11 cases for bad faith as "cause" under § 1112(b). See Marsch v. Marsch (In re Marsch), 36 F.3d 825, 828 (9th Cir. 1994) (per curiam) (reviewing for abuse of discretion bankruptcy court's decision to dismiss chapter 11 case as bad faith filing under § 1112(b)). We also note that Rule 3018(a) provides that the bankruptcy court may, but not necessarily must, permit a creditor to change its cast ballot, certainly implying that the court is vested with discretion in making its decision. We also review the bankruptcy court's decision to confirm a chapter 11 reorganization plan for an abuse of discretion. Computer Task Group, Inc. v. Brotby (In re Brotby), 303 B.R. 177,

184 (9th Cir. BAP 2003).

We apply a two-part test to determine objectively whether the bankruptcy court abused its discretion. United States v. Hinkson, 585 F.3d 1247, 1261-62 (9th Cir. 2009) (en banc). First, we "determine de novo whether the bankruptcy court identified the correct legal rule to apply to the relief requested." Id. Second, we examine the bankruptcy court's factual findings under the clearly erroneous standard. Id. at 1262 & n.20. We must affirm the bankruptcy court's factual findings unless those findings are "(1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" Id.

"Of course, a determination that a plan meets the requisite confirmation standards necessarily requires a bankruptcy court to make certain factual findings and interpret the law." Brotby, 303 B.R. at 184. We review the bankruptcy court's factual determinations regarding feasibility under § 1129(a)(11) and good faith under § 1129(a)(3) for clear error. Id. We will not disturb the bankruptcy court's factual determinations unless, after reviewing the entire evidence, we have a definite and firm conviction that a mistake has been made. Hinkson, 585 F.3d at 1260. We reverse the bankruptcy court only if we conclude that the bankruptcy court's factual determinations were illogical, implausible or without support in the record. Id. at 1261. If the bankruptcy court's "account of the evidence is plausible in light of the record viewed in its entirety," we may not reverse, even if we are convinced that, had we been in the position of factfinder, we would have weighed the evidence differently.

23

*Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-74 (1985). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id. at 574.

We review de novo the following issues as they involve questions of law: (1) whether plan treatment "impairs" a creditor's claim and (2) the bankruptcy court's determination of what factors to apply in a value determination. *Conn. Gen. Life Ins. Co. v. Hotel Assocs. of Tucson (In re Hotel Assocs. of Tucson)*, 165 B.R. 470, 473 (9th Cir. BAP 1994). We accord substantial deference to the bankruptcy court's cramdown interest rate determinations. Id.

We may affirm on any basis supported by the record. *Shanks v. Dressel*, 540 F.3d 1082, 1086 (9th Cir. 2008).

**DISCUSSION**

A. The bankruptcy court did not err in denying Beal Bank's ballot motion

Rule 3018(a)[15] allows a creditor to change its vote only on a showing of cause. As one bankruptcy court points out, the Bankruptcy Code does not provide any guidance as to what constitutes cause under Rule 3018(a). *In re CGE Shattuck, LLC*, 2000 WL 33679416 (Bankr. D.N.H. 2000).

> The test for determining whether cause has been shown should not be a difficult one to meet. As long as the reason for the vote change is not tainted, the change of vote should usually be permitted. The court must only ensure that the change is not improperly motivated.

_____

[15] Rule 3018(a) provides, in relevant part, "For cause shown, the court after notice and hearing, may permit a creditor . . . to change or withdraw an acceptance or rejection."

24

Kellogg Square P'ship, 160 B.R. at 334 (citing 8 Collier on Bankruptcy ¶ 3018.01[4] (15th ed. 1990)).

Here, Beal Bank emphasizes that the threshold to show cause under Rule 3018(a) is low. A creditor only need demonstrate that it has no "tainted" or improperly motivated reason for withdrawing its vote. Beal Bank freely admitted to the bankruptcy court and at oral argument that it bought Benedict's claim for the express purpose of blocking confirmation of a plan it believed to be proposed in bad faith by the debtor. According to Beal Bank, the bankruptcy court did not find this reason for its request to change Benedict's vote to be either tainted or improperly motivated. Appellant's Ballot Motion Opening Brief at 15. Because it did not find Beal Bank's request to withdraw Benedict's vote to be improper, Beal Bank argues, the bankruptcy court simply should have granted the ballot motion.

Beal Bank moreover contends that cause under Rule 3018(a) should be presumed to exist when a creditor seeks to withdraw its vote before the ballot deadline. Appellant's Ballot Motion Opening Brief at 26. Beal Bank argues that to deny a creditor's request to withdraw its vote when it was made before the ballot deadline would deprive the creditor "the full benefit of their right of franchise under Chapter 11." Appellant's Ballot Motion Opening Brief at 28. As long as the debtor suffers no prejudice from the creditor's withdrawal of the vote, Beal Bank reasons, the bankruptcy court should allow the creditor to do so. Id.

Little authority exists addressing this issue. In In re Kellogg Square P'ship, 160 B.R. 332 (Bankr. D. Minn. 1993), the bankruptcy court faced facts similar to the matter before us. In

25

Kellogg Square P'ship, Prudential Insurance Company of America ("Prudential"), the debtor's largest and only secured creditor, purchased claims from several of the debtor's unsecured creditors. Prudential obtained assignments of these claims after these creditors had cast their votes accepting the debtor's plan. Prudential then moved to change the acceptances to rejections under Rule 3018(a). Like Beal Bank, Prudential's strategy in purchasing the claims and changing the votes was to defeat confirmation of the debtor's plan so as to avoid cramdown treatment of its secured claim.

The bankruptcy court found that Prudential did not show cause under Rule 3018(a) to modify the votes, as the only cause alleged by Prudential was that it would not have voted the claims in favor of the debtor's plan. Kellogg Square P'ship, 160 B.R. at 335. The bankruptcy court reasoned that allowing an assignee-creditor to change the vote previously cast by the assignor undermines a basic principle of assignments. Id. Generally, "an entity which acquires a claim [against a bankruptcy estate] steps into the shoes of that claimant, enjoying both the benefits and the limitations of the claim, as a successor in interest." Id. (quoting In re Applegate Prop., Ltd., 133 B.R. 827, 833 (Bankr. W.D. Tex. 1991) (internal quotation marks omitted)). The bankruptcy court concluded that "where an entity acquires a creditor's claim after the creditor has already cast a vote on a plan of reorganization, the assignor-creditor's evidenced commitment to that specific participation in the case is a permanent, binding limitation on the transferred claim." Id.

It further reasoned that allowing an assignee-creditor to

26

change the assignor's previously cast vote would undercut the "certainty in the dynamics of reorganization under chapter 11." Id. "[W]ere pre-transfer votes not binding on the assignees of claims, creditors would be left to select not the best plan [of reorganization] but the best deal they might be able to individually negotiate, with the major constituencies vying for control of the case, behind the scene of the confirmation process." Id. (quoting Applegate Prop., Ltd., 133 B.R. at 836 (internal quotation marks omitted)).

Beal Bank contends that the reasoning of Kellogg Square P'ship goes against current Ninth Circuit authority concerning the law of assignments as set forth in Boyajian v. New Falls Corp. (In re Boyajian), 564 F.3d 1088 (2009). Boyajian established that an assignee-creditor may pursue a § 523(a)(2)(B) action against a debtor as long as the assignee-creditor shows that the original creditor relied on the debtor's materially false statement. Because the reasoning of Kellogg Square P'ship conflicts with Boyajian, Beal Bank argues, it does not apply here.

We do not quibble with Beal Bank in its assertion that, as the assignee-creditor, it had the right to seek withdrawal of Benedict's vote. But Beal Bank misses the essential point of Kellogg Square P'ship: like the bankruptcy court here, the Kellogg Square P'ship bankruptcy court found that Prudential did not establish cause under Rule 3018(a) to change the vote of the assignor-creditors.

The bankruptcy court in In re MCorp Fin., Inc., 137 B.R. 237 (Bankr. S.D. Tex. 1992), also considered a motion to allow a

27

change in vote on a chapter 11 plan. In MCorp Fin., Inc., an unsecured creditor moved to change his vote rejecting the chapter 11 plan to one accepting it shortly after he reached an agreement with the debtor regarding treatment of his claim in the chapter 11 plan. After pointing out that a change in vote under Rule 3018(a) is the exception rather than the rule, id. at 238, the bankruptcy court went on to indicate that the standard for such a change is fairly relaxed, echoing the Kellogg bankruptcy court in citing Collier. The bankruptcy court then listed examples justifying vote changes, including "a breakdown in communications at the voting entity, misreading the terms of the plan, or execution of the first ballot by one without authority. In such circumstances, the vote could be changed in order to allow the voting entity to intelligently express its will." Id.

The bankruptcy court in MCorp Fin., Inc. ultimately denied the unsecured creditor's motion to change his vote, determining that his requested vote change was "prompted by a subsequent agreement, and was made in writing only after testimony in the confirmation hearing which made the ballot important." Id. at 239. It found that "the timing of the change [was] highly suspect, and the evidence [did] not overcome the possibility of improper motivation." Id. The bankruptcy court concluded that the unsecured creditor failed to meet his burden of proof to establish that the requested change was not improperly motivated. Id.

Beal Bank maintains that the bankruptcy court did not find that it had an improper motivation in seeking to withdraw Benedict's claim. But the bankruptcy court did make such a

28

finding: it found that Beal Bank's reason to block confirmation "did the process violence."  It further found that it was <u>not</u> "appropriate [for creditors] to wait 'til the plans [were] balloted and then decide what claims [they were] going to buy."

The bankruptcy court moreover found that "cause" under Rule 3018(a) required something more than a mere change of heart. It determined that withdrawing a previously cast vote for the purpose of strategy (i.e., for the purpose of blocking plan confirmation) was not cause under Rule 3018(a).

The bankruptcy court found that Beal Bank did not establish cause for withdrawing Benedict's vote.  It further found that Beal Bank's reason for withdrawing Benedict's vote was improperly motivated.  While it is a close question, we conclude that the bankruptcy court did not abuse its discretion in denying the ballot motion.

B.   <u>The bankruptcy court did not err in finding that the debtor's second amended plan was feasible</u>

"To confirm a plan, a bankruptcy court must find that the plan is feasible, meaning that confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor." <u>Sherman v. Harbin (In re Harbin)</u>, 486 F.3d 510, 517 (9th Cir. 2007).  Feasibility requires only that the debtor demonstrate that the plan has a "reasonable probability of success." <u>Acequia, Inc. v. Clinton (In re Acequia, Inc.)</u>, 787 F.2d 1352, 1364 (9th Cir. 1986).  "The Code does not require the debtor to prove that success is inevitable or assured, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports

29

a finding of feasibility." Wells Fargo Bank v. Loop 76, LLC (In re Loop 76, LLC), 465 B.R. 525, 544 (9th Cir. BAP 2012). The debtor cannot confirm a plan that is "a visionary scheme which promises more than the debtor can deliver." Id. (quoting Wiersma v. O.H. Kruse Grain & Milling (In re Wiersma), 324 B.R. 92, 112-13 (9th Cir. BAP 2005), aff'd in part, rev'd in part on other grounds, 227 Fed. Appx. 603 (9th Cir. 2007) (internal quotation marks omitted)). "Because feasibility is an issue of fact, we give due regard to the bankruptcy court's evaluation of witness testimony and any inferences drawn by the court." Loop 76, LLC, 465 B.R. at 544.

Beal Bank contends that the debtor failed to provide evidence of sufficient cash flow to fund and maintain its business operations and pay its plan obligations. Beal Bank moreover argues that the debtor did not provide any evidence that it likely will be able to refinance or sell the real property at the end of the plan term to make the balloon payment. In particular, Beal Bank argued that the debtor offered no expert testimony on feasibility or on the likelihood of refinancing the real property and no projections or other "concrete" evidence of sufficient cash flow. Beal Bank further argued that the debtor also failed to offer evidence as to the value of the real property beyond the confirmation date; it provided no evidence of the real property's value on early termination or termination of the lease with Allegiant or the maturity date of the loan with Beal Bank.

Beal Bank points out that the bankruptcy court relied on a statement made by Funsten in his interest rate report in

30

determining that the plan was feasible. Specifically, on page 520 of his report, Funsten stated that "if commercial property values in 2021 are no different than today, the remaining principal to be refinanced will have a loan-to-value ("LTV") of 68%." Beal Bank stresses that Funsten was the debtor's interest rate expert and was not qualified as an expert on financing or any other aspect of feasibility. It also contends that the real property valuation report provided by the debtor's other expert witness, Charles Jack, was faulty in its assumption that the real property's value will remain unchanged.

Beal Bank overstates the bankruptcy court's reliance on Funsten's report in its feasibility determination. The bankruptcy court mentioned that Funsten's report provided evidence as to the potential for refinancing or sale of the real property, but it looked to other evidence in determining the second amended plan's feasibility. The bankruptcy court found that the second amended plan was feasible because: (1) the debtor had sufficient income to fund the second amended plan because the rental income it received exceeded the monthly payments to Beal Bank; (2) the debtor stood to receive substantial damages (approximately $1.2 million) from Allegiant in the event of early lease termination; (3) Beal Bank had a sizeable equity cushion, based on the current real property valuation, which only would grow over time as the debtor made payments under the second amended plan; and (4) the debtor had a healthy cash balance.[16]

---

[16] We also point out that the debtor presented evidence that it intended to save the difference between the rental income from

(continued...)

The bankruptcy court further determined that there was nothing in the evidence before it suggesting that the real property's value would decline. It also determined that it was unlikely that Allegiant would terminate the lease early, based on the real property's unique characteristics and the costs to Allegiant in relocating. Beal Bank moreover did not offer any evidence indicating that the real property's value would decline. Beal Bank also did not dispute the debtor's current valuation of the real property.

Although the debtor apparently did not provide income projections, its monthly operating reports suffice to show that it had sufficient cash flow to fund the second amended plan. Beal Bank did not object to any of the monthly operating reports submitted by the debtor or offer any evidence of its own indicating that the debtor had insufficient cash flow to fund the second amended plan.

Based on the record before us, we conclude that it supports the bankruptcy court's feasibility determination.

C.  **The bankruptcy court made determinations as to good faith under § 1129(a)(3)**

"Section 1129(a)(3) does not define good faith. A plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Code. The requisite good faith determination is based on the totality of the

---

[16](...continued)
Allegiant and the payments to Beal Bank to build up its cash reserves to continue funding the plan if Allegiant terminated the lease early.

circumstances." Platinum Capital, Inc. v. Sylmar Plaza, LP (In re Sylmar Plaza, LP), 314 F.3d 1070, 1074 (9th Cir. 2002) (citations omitted). The creation of an impaired class in "an attempt to gerrymander a voting class of creditors is indicative of bad faith" for purposes of § 1129(a)(3). Conn. Gen. Life Ins. Co. v. Hotel Assocs. of Tucson (In re Hotel Assocs. of Tucson), 165 B.R. 470, 475 (9th Cir. BAP 1994).

Beal Bank asserts that the debtor did not propose the second amended plan in good faith because it created an artificially impaired class by providing deferred, no-interest payments to Marquis & Aurbach and Benedict, though the debtor had ample funds with which to pay them in full on the effective date.

The record in its totality amply supports a conclusion that the debtor's second amended plan achieves a result consistent with the objectives and purposes of the Bankruptcy Code. See Shanks, 540 F.3d at 1086; In re Sylmar Plaza, LP, 314 F.3d at 1074. The debtor presented a feasible plan that will pay all allowed claims in full over time. Beal Bank will retain its security interest in the real property until its allowed claim, with interest at an appropriate rate, is paid in full. As noted above, the evidence submitted by the debtor in support of confirmation presented multiple business and economic reasons for deferring payment of allowed unsecured claims. In light of our review of the entire record, we do not have a definite and firm conviction that the bankruptcy court erred in determining that the debtor proposed its second amended plan in good faith, or in its ultimate determination that the debtor satisfied the requirements for confirmation of its second amended plan.

33

**CONCLUSION**

Because the bankruptcy court did not find that Beal Bank had cause under Rule 3018(a) to withdraw Benedict's vote accepting the second amended plan, it did not err in denying Beal Bank's ballot motion. The bankruptcy court also did not err in finding that the debtor satisfied the requirements for confirming its second amended plan. We therefore AFFIRM the bankruptcy court's rulings on the ballot motion and plan confirmation.

34